UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CYNTHIA J. VICKERS,

    Plaintiff,

      v.

DONALD E. POWELL, Chairman, Federal
Deposit Insurance Corporation,

    Defendant.

Civil Action No. 03-174 (CKK)

**MEMORANDUM OPINION**
(November 21, 2005)

Plaintiff Cynthia Vickers filed this suit against Defendant Donald Powell in his official

capacity as Chairman of the Federal Deposit Insurance Corporation ("FDIC" or "Agency") for

employment discrimination and retaliation, and for judicial review of a determination by the

Merit Systems Protection Board ("MSPB") upholding the FDIC's decision to terminate her

employment in 2001.  Plaintiff's suit rests on two separate statutory schemes:  (1) the Civil

Service Reform Act of 1978 ("CSRA"), Pub. L. No. 95-454, 92 Stat. 1111 (codified as amended

in sections of 5 U.S.C. (2004)), governing this Court's review of the MSPB's decision upholding

Plaintiff's removal, *see* 5 U.S.C. § 7703(b)(2); and (2) Title VII of the Civil Rights Act of 1964

("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.*, governing Plaintiff's claims that (a) her

removal was motivated by discrimination based upon her race (African-American) and her

gender (female), and upon retaliation for having engaged in Equal Employment Opportunity

("EEO") activity; and (b) she was subjected to a hostile work environment based on race and

gender.

Currently before the Court is Defendant's Motion for Summary Judgment as to all of the claims alleged in Plaintiff's First Amended Complaint.  The Agency contends that the MSPB Administrative Law Judge's decision upholding Plaintiff's removal under the CSRA was supported by "substantial evidence," *see Fogg v. Ashcroft*, 254 F.3d 103, 112 (D.C. Cir. 2001), in the administrative record.  The Agency further asserts that evidence adduced both at the administrative hearing and in the discovery process in this case demonstrates that the FDIC had legitimate, non-discriminatory, non-retaliatory reasons for removing Plaintiff as a federal law enforcement officer, given the precarious nature of her position in which she was entrusted with a weapon capable of lethal force.  Finally, the Agency argues that Plaintiff's hostile work environment claims must fail because (1) most of the alleged incidents comprising her a hostile work environment occurred up to eight years before Plaintiff made any contact with the FDIC's EEO office and are therefore untimely, and (2) the remaining incidents – even in aggregate – are insufficient to give rise to a claim of hostile work environment.

Upon a searching examination of Defendant's motion, Plaintiff's Opposition, Defendant's Reply, Plaintiff's Surreply, Defendant's Motion to Strike Plaintiff's Surreply, Plaintiff's Response to Defendant's Motion to Strike, the relevant case law, and the entire record herein, the Court shall grant Defendant's Motion for Summary Judgment in full.

## I: BACKGROUND

A.      *Plaintiff Joins the OIG as a Criminal Investigator/Special Agent*

Plaintiff is an African-American female, First Am. Compl. ¶ 4, who commenced employment with the federal government in 1984 as a Special Agent for the Naval Investigative Service.  Def.'s Stmt. of Mat. Facts ¶ 1; Pl.'s Response to Def.'s Stmt. ¶ 1.  In July 1991,

Plaintiff accepted a CG-1811-13 Criminal Investigator/Special Agent position with the FDIC's

Resolution Trust Corporation ("RTC") in the Atlanta Regional Office.  *Id.*; Am. Compl. ¶ 7.

Pursuant to 12 U.S.C. § 1441a(m), the RTC was merged into the FDIC's Office of Inspector

General ("OIG") on January 1, 1996.  Def.'s Stmt. of Mat. Facts ¶ 1 & n. 11; Pl.'s Response to

Def.'s Stmt. ¶ 1.  As a Criminal Investigator/Special Agent, Plaintiff was trained in the use of

lethal and non-lethal force, and was authorized to carry an Agency-issued semi-automatic pistol.

Def.'s Stmt. of Mat. Facts ¶ 2; Pl.'s Response to Def.'s Stmt. ¶ 2 (during the course of her career,

Plaintiff never had occasion to use her firearm).  Her duties as a Criminal Investigator/Special

Agent included the investigation of criminal activity, interviewing suspects and witnesses,

obtaining and executing search warrants, serving subpoenas, conducting surveillance, and

making arrests.  *Id.*; *but see* Pl.'s Response to Def.'s Stmt. ¶ 2 (in the course of her duties,

Plaintiff did not conduct surveillance and rarely served subpoenas; virtually none of her actual

daily duties required her to carry a firearm).  In the course of her performance, Plaintiff would be

called upon to carry out these activities alone, with other OIG Special Agents, or in conjunction

with agents of other federal, state, or local agencies.  Def.'s Stmt. of Mat. Facts ¶ 2; Pl.'s

Response to Def.'s Stmt. ¶ 2.  Pursuant to 5 C.F.R. § 339.202, Plaintiff's position with the

Agency was subject to mandatory medical standards.  Def.'s Stmt. of Mat. Facts ¶ 3; Pl.'s

Response to Def.'s Stmt. ¶ 3.  Specifically, the standards applicable to the Agency's Criminal

Investigators/Special Agents require Investigators to be free of mental or emotional instabilities

that inhibit the performance of law enforcement duties such as using firearms.  *Id.*

Dana Bedwell was the Special Agent in Charge ("SAC") of the Atlanta OIG

Investigations Office from mid-1996 until March 2001.  Def.'s Stmt. of Mat. Facts ¶ 4; Pl.'s

Response to Def.'s Stmt. ¶ 4.  As the SAC, Mr. Bedwell was Plaintiff's first-line supervisor.  *Id.*
Even before he was named SAC, Mr. Bedwell had begun working with Plaintiff in August 1995,
when he was transferred to the Atlanta Office as a non-supervisory Grade 14 Special Agent.  *Id.*
The relationship between Plaintiff and SAC Bedwell, at minimum, can be described as
"somewhat strained."  *Id.*  For instance, Plaintiff felt that SAC Bedwell's standards for her, the
only permanent African-American Special Agent in the office, were different than those for
others, that the grade structure in the office was unfair, that her work was not valued as highly as
the work of others in the office, and that the performance evaluation system was unfair and
merely a personality contest in which the highest rating was regularly reserved for white males
and a few chosen white females.  *See* Pl.'s Response to Def.'s Stmt. ¶ 4.  SAC Bedwell was
likewise frustrated with Plaintiff, who always refused to sign her annual performance appraisals
to acknowledge receiving the document.  Def.'s Stmt. of Mat. Facts ¶ 4; Pl.'s Response to Def.'s
Stmt. ¶ 4.  Despite this strain or tension between Plaintiff and SAC Bedwell, Plaintiff received
good marks from SAC Bedwell on her annual performance appraisals, garnering a 2.6 out of 3.0
in October 1999 and a 2.7 out of 3.0 in October 2000; Plaintiff also received a $1,500.00
performance award at SAC Bedwell's direction for the 1999-2000 performance cycle.  Def.'s
Stmt. of Mat. Facts ¶ 5; Pl.'s Response to Def.'s Stmt. ¶ 5.

       B.     *The October 31, 2000 Confrontation Between Plaintiff and SAC Bedwell*

The events leading up to Plaintiff's removal from her position with the FDIC commenced
on Tuesday, October 31, 2000, when Plaintiff sent an email to SAC Bedwell informing him that
she would be out of the office starting Wednesday, November 1, 2000, and would be returning to
work on Friday, November 3, 2000 in order to work on the McConnell case in Columbia, South

Carolina.  Def.'s Stmt. of Mat. Facts ¶ 6; Pl.'s Response to Def.'s Stmt. ¶ 6.  She additionally

informed SAC Bedwell that she would be out for the majority of the following week (November

6, 2000) working on the Adams matter in Douglasville and Carrollton, Georgia, and would be

out for the entirety of the week of November 13, 2000 for medical reasons.  *Id.*  Almost

contemporaneously with Plaintiff's sending of the email, SAC Bedwell – having not yet read the

message – stopped by her office to briefly chat about whether she was prepared for the week

ahead.  AR Tab 18 (Pl.'s Admin. Hr'g Test.), at 150:19-24, 151:2-12.  Informed by Plaintiff that

she had sent him an email regarding her plans, SAC Bedwell returned to his office to read the

message.  *Id.* at 152:6-8 (Pl.'s Admin. Hr'g Test.).  SAC Bedwell responded to Plaintiff's email

within the hour in an email that stated something to the effect of "When you have a few moments

today I would like to talk with you about your email as I have a few questions about your plans.

Thanks."  Def.'s Stmt. of Mat. Facts ¶ 7; Pl.'s Response to Def.'s Stmt. ¶ 7; AR Tab 18 (Pl.'s

Admin. Hr'g Test.), at 152:18-25 ("And a few minutes later I received a[n] e-mail from him

saying I have questions about your – He said I have questions.").[1]

---

[1] Plaintiff contends that the actual email containing her message to SAC Bedwell and his
response that was produced by the Agency (during the MSPB process and this case) was
falsified.  *See* Pl.'s Surreply at 1-4.  Plaintiff did not object to the introduction of the document
before the MSPB Administrative Law Judge for tactical reasons, *id.* at 2, but does object to the
email in this case.  *See id.*; *see also* Pl.'s Response to Def.'s Stmt. ¶ 7.  In support of her claim,
Plaintiff now notes that (1) the email correctly spells the name of the case that she was working
on – McConnell – whereas she regularly misspelled the name, and (2) the email had gone
missing for quite some time, and was only discovered by SAC Bedwell on the eve of his
deposition, indicating to her that the email produced was altered or falsified by SAC Bedwell.
Pl.'s Surreply at 3-4.  Regardless of the authenticity of the produced email, Plaintiff admits that
she "did receive a document with a similar statement."  Pl.'s Surreply, Ex. 1 (Aug. 30, 2004
Vickers Dep.) at 180:10-11, 181:7-10 ("I received a document.  And I did receive an e-mail with
similar language in it.  But I do not recall – I don't believe that this is the email that I received.").
As such, the Court considers this dispute immaterial for the purpose of resolving the present
motion.

Later that morning, in response to his email, Plaintiff met with SAC Bedwell in his office. *Id.* At the meeting, SAC Bedwell asked Plaintiff why she was traveling to Columbia, South Carolina, on the McConnell case and to Carrollton and Douglasville, Georgia, on the Adams case. *Id.* SAC Bedwell was especially interested in Plaintiff's answers, given that he believed that the McConnell and Adams cases required little additional investigative effort, whereas he would rather have had Plaintiff spend her time working on an older case called "Krotzer." Def.'s Stmt. of Mat. Facts ¶ 7 n.14; Pl.'s Response to Def.'s Stmt. ¶ 7. Upon SAC Bedwell's flurry of questions about the number and type of interviews that would be necessary in the Adams case, AR Tab 18 (Pl.'s Admin. Hr'g Test.), at 154:16-21, Plaintiff was unable to provide SAC Bedwell with an estimate of the number of interviews to be done off the top of her head. *Id.*; *see also* AR Tab 18 (Pl.'s Admin. Hr'g Test.), at 153-57 ("I started to respond to his questions by saying I can't tell you off the top of my head how many interviews there are to be done."). Plaintiff responded, instead, that she felt SAC Bedwell was micro-managing her. Def.'s Stmt. of Mat. Facts ¶ 7; Pl.'s Response to Def.'s Stmt. ¶ 7; AR Tab 18 (Pl.'s Admin. Hr'g Test.), at 156:20-157:18. In response to Plaintiff's accusations of micro-management, SAC Bedwell responded, "I don't know what you're getting upset about, I cut you more slack than anyone around here." *Id.* Both Plaintiff and SAC Bedwell testified that the meeting took an angry turn, with both raising their voices to the other. *Id.* Plaintiff testified, consistent with SAC Bedwell's testimony, that she eventually stood up, said "I don't need this," and "I'm out of here," and walked out of his office, and then the workplace. *Id.*

After she walked out of the workplace upset over the confrontation, Plaintiff left behind, with the office secretary, the following items: her law enforcement credentials, her FDIC

identification card, her building access card, her government-issued cellular telephone, and her

government-issued MCI calling card.  Def.'s Stmt. of Mat. Facts ¶ 8; Pl.'s Response to Def.'s

Stmt. ¶ 8.  The next day, Plaintiff's spouse appeared at the office, retrieved some of Plaintiff's

personal possessions, and turned in her government credit card, office keys, beeper, and laptop

computer.  *Id.*  Plaintiff never sought to reconvene her meeting with SAC Bedwell.  *Id.*

      C.    *Plaintiff on Leave From the FDIC's OIG Office*

On November 2, 2000, SAC Bedwell sent Plaintiff a letter recounting the upsetting

meeting of October 31st, and informing her that he had granted her – on his own initiative – four

hours of administrative leave for the balance of that workday; that she had not contacted

Bedwell, nor any other OIG management official regarding her abrupt departure or her intentions

with respect to her continued employment with the Agency; and that, accordingly, she was being

placed on an Absent Without Leave ("AWOL") status until such time as she either resigned her

position or returned to work.  Def.'s Stmt. of Mat. Facts ¶ 9; Pl.'s Response to Def.'s Stmt. ¶ 9.

In addition, SAC Bedwell provided information regarding resignation procedures, and advised

Plaintiff that if she returned to work, she would need to do so no later than 8:30 a.m. on Monday,

November 6, 2000.  *Id.*  Finally, SAC Bedwell advised Plaintiff that if she either failed to resign

or to report to work as directed, he would be left with no alternative "but to initiate an action to

remove [her] from [her] Federal position."  *Id.*  Plaintiff received SAC Bedwell's letter and

reviewed its contents.  Pl.'s Response to Def.'s Stmt. ¶ 9.

On Monday, November 6, 2000, Plaintiff appeared at the Atlanta OIG office at 6:30 a.m.,

handed SAC Bedwell a letter, turned away without speaking, and left the building.  Def.'s Stmt.

of Mat. Facts ¶ 10; Pl.'s Response to Def.'s Stmt. ¶ 10.  The letter stated that:

> Due to the mental, emotional and physical anguish that I am experiencing as a result of my employment with FDIC-OIG, I am requesting six months leave without pay to resolve those medical issues.  It is my request that this leave commence immediately.

*Id.*  This brief contact represented the last meeting between Plaintiff and SAC Bedwell, who retired in March 2001.  *Id.*

Between December 2000 and March 2001, Plaintiff was treated for severe depressive disorder.  Def.'s Stmt. of Mat. Facts ¶ 11; Pl.'s Response to Def.'s Stmt. ¶ 11.  In March 2001, Plaintiff submitted to the FDIC a letter from her psychiatrist opining that Plaintiff could return to duty on May 1, 2001.  *Id.*  SAC Bedwell, by letter dated March 23, 2001, and citing to 5 C.F.R. § 339.301, directed Plaintiff to report for a medical examination by doctors of the Federal Law Enforcement Medical Programs, Federal Occupational Health, United States Public Health Service ("PHS") in Atlanta.  *Id.*  More particularly, the letter directed Plaintiff to report to the Public Health Service on April 9, 2001, to have a blood sample drawn, and on April 10, 2001, for a physical examination.  *Id.*  The letter stated, in relevant part:

> Title 5 CFR 339.301 provides for the authority to require an employee who occupies a position that has physical and medical standards to report for a medical evaluation whenever there is a question about the employee's capacity to meet the medical and physical requirements of the position.
>
> You occupy the position of Criminal Investigator, and this position does have specific medical standards and physical requirements.  As a result, before you can return to work, you are required to obtain medical certification that you meet the medical standards and physical requirements of your position and can perform the essential functions of your job.  This certification will encompass not only a medical evaluation by your own physician but a physical evaluation by the United States Public Health Service (PHS) as well as a psychiatric evaluation by a physician of the Corporation's choosing.

> *    *    *    *    *    *    *    *    *    *    *    *

8

Failure to keep these appointments and submit to the required examinations will result in disciplinary action up to and including removal.

*Id.*

D.      *Plaintiff's Efforts at Compliance With the Medical Examination*

On April 9, 2001, Plaintiff reported for her medical examination as directed.  Def.'s Stmt. of Mat. Facts ¶ 12; Pl.'s Response to Def.'s Stmt. ¶ 12.  A blood sample was obtained, and hearing, vision, and EKG tests were undertaken without controversy.  *Id.*  Plaintiff was asked to return the next day for the remainder of the examination with a completed medical history and release forms.  Def.'s Stmt. of Mat. Facts ¶ 12; Pl.'s Response to Def.'s Stmt. ¶ 12 (noting that it had not been made clear to her what the medical examination would entail or what tests she was supposed to complete).

On April 10, 2001, Plaintiff returned to the Public Health Service.  Def.'s Stmt. of Mat. Facts ¶ 13; Pl.'s Response to Def.'s Stmt. ¶ 13.  However, on the advice of counsel, she refused to complete a medical history form, but did provide medical history information in her conversation with the examining Public Health Service physician, Dr. Richard Miller.  *Id.*  After completing the physical examination, Plaintiff refused again, on the advice of her counsel, to execute any releases to authorize access to her private medical records or private physicians.  *Id.*  One release was contained on the last page of the United States PHS multi-page examination report form ("the Exam Form"); while the other release was a one-page, stand alone release form ("the Authorization for Disclosure of Information Form").  *Id.*; *see also* AR, Tab 3-4(g)(2) (Authorization for Disclosure of Information Form); AR, Tab 3-4(g)(2), Tab 3-4(j), Tab 18, Agency Hr'g Ex. 4, Tab 21 at 6.  Plaintiff had previously signed the identical Exam Form release

without objection on January 21, 2000, in connection with a routine periodic medical examination required by the medical standards applicable to her position as a Criminal Investigator.  *Id.*  According to Plaintiff, she objected to signing both releases provided to her on April 10, 2001, because they were blank and did not identify to whom her medical information would be provided.  Pl.'s Response to Def.'s Stmt. ¶ 13.  Plaintiff's refusal to (1) complete the medical history form and (2) the two medical releases brought the evaluation process to a halt.  Def.'s Stmt. of Mat. Facts ¶ 14; Pl.'s Response to Def.'s Stmt. ¶ 14 (admitting that the process ground to a halt, but claiming that "[i]t was the FDIC's failure to fill out the release forms to identify to whom the medical information would be provided that stalled the process).

> The Exam Form medical release that Plaintiff refused to sign stated, as follows:
>
> I certify that I have reviewed the foregoing information supplied by me and that it is true and complete to the best of my knowledge.  I authorize any of the doctors, hospitals, or clinics mentioned on these forms to furnish the Government a complete transcript on my medical record for purposes of processing this exam.  I authorize the release of all medical information to the Federal Occupational Health/Law Enforcement Medical Program and on a need to know basis, the designed (Agency/Name) point of contact.

Initial Desc. at 6-7 (citing Agency Response, Tab 4(g)(2), Ex. 4 to Hr'g Tr.).  In contrast, the Authorization for Disclosure of Information Form, a "form FOH-9," contained some blanks that were not yet completed.  *Id.* at 10-11 (citing AR, Tab 3-4(g)(2)).

E.     *Post-Examination Communications*

On April 18, 2001, Acting SAC Thomas McDade sent Plaintiff a letter instructing her to return to the PHS to complete the medical history form and relevant releases.  Def.'s Stmt. of Mat. Facts ¶ 15; Pl.'s Response to Def.'s Stmt. ¶ 15.  The letter, in pertinent part, stated:

On April 9 and 10, 2001, you were scheduled for blood work and a physical examination with the Public Health Service (PHS) in Atlanta as part of the evaluation process to determine your ability to perform the essential functions of your position after your extended absence.  You occupy the position of a Criminal Investigator that has specific medical standards and physical requirements.

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

However, PHS has also advised us that, on the advice of your attorney, you refused to complete and sign the Federal Occupational Health Form.  Without your input and signature on this form, the attending PHS physician is unable to complete diagnostic and physical findings portions of the form.  Further, the needed psychiatric evaluation can not take place until the completion of the physical examination process.

Without this information, the evaluation process to determine your ability to return to work and perform the essential functions of your position, with or without accommodation, is incomplete.  Accordingly, you are directed to return to the PHS Office at the Richard B. Russell Federal Building, located at 75 Spring Street, Lower Plaza Level, Atlanta GA 30303, to complete the form and sign the release by COB Friday, April 20, 2001.  You do not need an appointment to complete this form; however, if you wish to contact that office, the telephone number is (404) 331-3340.

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

Failure to complete the Occupational Health Form will be grounds for disciplinary action up to and including removal.

*Id.*

Plaintiff received Acting SAC McDade's letter on April 20, 2001.  Def.'s Stmt. of Mat. Facts ¶ 16; Pl.'s Response to Def.'s Stmt. ¶ 16.  Plaintiff did not return to the PHS as instructed, and, accordingly, did not execute the medical history form and releases.  *Id.*  Plaintiff's attorney – who was her point of contact with the FDIC at that point – stated at Plaintiff's Oral Reply to her proposed removal that Plaintiff could not comply with SAC McDade's instructions because she received the letter too late in the day to make child care arrangements.  *Id.*  Plaintiff's attorney

also stressed that the medical release was blank, raising concerns.  Pl.'s Response to Def.'s Stmt.

¶ 16.  However, regardless of the feasibility of same-day child care arrangements or whether

Plaintiff could have brought her then ten-year-old son with her to sign the forms, *see* Pl.'s Opp'n

at 5, Def.'s Reply at 13, it is uncontested that Plaintiff did not attempt to contact SAC McDade

upon receipt of the April 18 letter, as he explicitly invited her to do in the event that she had

concerns, nor did she attempt to contact any member of FDIC management, nor did she attempt

to phone the PHS.  Def.'s Stmt. of Mat. Facts ¶ 16; Pl.'s Response to Def.'s Stmt. ¶ 16.  The next

contact between Plaintiff and the FDIC was through a letter from her attorney dated April 27,

2001.  Pl.'s Response to Def.'s Stmt. ¶¶ 16-17.  The letter from Plaintiff's counsel stated, in

relevant part,

> Please by advised that Ms. Vickers is willing to certify that the information she
> provided to the examining physician is true and complete to the best of her
> knowledge.  However, we believe that a wholesale disclosure of her entire
> medical history, whether to medical or lay personnel, is an unnecessary and
> unauthorized intrusion on her medical and her personal privacy.

AR Tab 7 (April 27, 2001 Letter from Joleen Payeur Olsen, Plaintiff's counsel, to Janet Welch,

FDIC Employee Relations Specialist) at 4.

      F.    *Plaintiff's Removal*

      The FDIC/OIG first proposed Plaintiff's removal in a letter dated April 30, 2001.  Def.'s

Stmt. of Mat. Facts ¶ 17; Pl.'s Response to Def.'s Stmt. ¶ 17.  Plaintiff replied in writing on May

12, 2001, and made an oral reply to her proposed removal on May 24, 2001.  *Id.*  After

considering Plaintiff's replies, the Agency withdrew the April 30, 2001 proposal and issued a

second, superseding proposed removal on September 24, 2001.  *Id.*  The September 24th

proposed removal included, as grounds therefor, *inter alia*, charges that Plaintiff failed to

cooperate in her medical examination by failing to complete and execute the U.S. Public Health

Service medical release forms, and charges that Plaintiff failed to follow instructions because (1)

she failed to provide the specific information demanded of her by SAC Bedwell on October 31,

2001, and (2) she failed to comply with Acting SAC McDade's instructions to return to the PHS

on April 20, 2001 to complete the medical history form and release.  Def.'s Stmt. of Mat. Facts ¶

18; Pl.'s Response to Def.'s Stmt. ¶ 18.  Plaintiff responded to the September 24th proposed

removal in writing on October 1, 2001.  *Id.*

By a letter dated December 6, 2001, Assistant Inspector General for Investigations

("AIGI") Samuel Holland removed Plaintiff from federal service effective December 14, 2001.

Def.'s Stmt. of Mat. Facts ¶ 19; Pl.'s Response to Def.'s Stmt. ¶ 19.

G.     *The MSPB Process*

Plaintiff filed her initial MSPB appeal with the Atlanta Regional Office of the MSPB on

January 11, 2002.  Def.'s Stmt. of Mat. Facts ¶ 20; Pl.'s Response to Def.'s Stmt. ¶ 20.  Plaintiff

denied wrongdoing and alleged that her removal was the result of race and sex discrimination

and retaliation for having engaged in EEO activity.  *Id.*  Plaintiff further alleged that she had been

removed from federal service in retaliation for making whistle blowing disclosures to AIGI

Samuel Holland about an allegedly racially and sexually hostile work environment in the Atlanta

OIG office during September 2000.  *Id.*  MSPB Judge Lynn P. Yovino dismissed Plaintiff's

appeal without prejudice on April 29, 2002, so that Plaintiff could undergo a fitness-for-duty

examination to insure that reinstatement would be an available remedy in the event of a ruling

favorable to Plaintiff.  Def.'s Stmt. of Mat. Facts ¶ 21; Pl.'s Response to Def.'s Stmt. ¶ 21.

Plaintiff cooperated in the physical examination and psychological evaluation, and in May 2002

was determined to be fit for duty. *Id.* Plaintiff timely refiled her appeal on July 19, 2002. Def.'s Stmt. of Mat. Facts ¶ 22; Pl.'s Response to Def.'s Stmt. ¶ 22.

At a pre-trial hearing conference held on October 10, 2002, Administrative Law Judge Yovino rejected Plaintiff's allegation of hostile work environment for lack of relevance in the removal action before her. Def.'s Stmt. of Mat. Facts ¶ 23; Pl.'s Response to Def.'s Stmt. ¶ 23 (asserting that this decision was erroneous, as such material was relevant to show the discriminatory intentions of FDIC officials who supervised Plaintiff and to explain the reasons for her actions on October 31, 2000). Pursuant to Plaintiff's request, a hearing was held before Administrative Law Judge Yovino on October 21, 2002. Def.'s Stmt. of Mat. Facts ¶ 24; Pl.'s Response to Def.'s Stmt. ¶ 24.

Administrative Law Judge Yovino issued her Initial Decision on December 9, 2002, which became the final decision of the MSPB on January 13, 2003, when Plaintiff declined to file a petition for review with the full Board of the MSPB. *Id.* In her Initial Decision, Administrative Law Judge Yovino affirmed the charge that Plaintiff failed to follow instructions and its two underlying specifications – i.e., failure to provide SAC Bedwell with information that he requested about her cases during the October 31, 2000 meeting and failure to return to the PHS after having been directed to do so by SAC McDade's April 18, 2001 letter. Def.'s Stmt. of Mat. Facts ¶ 18 n.16; Pl.'s Response to Def.'s Stmt. ¶ 18. The Administrative Law Judge also sustained as modified the Agency's charge that Plaintiff failed to cooperate in her medical examination. *Id.* Administrative Law Judge Yovino did not sustain a charge by the Agency that Plaintiff had disrespected her supervisor, SAC Bedwell, during the October 31, 2000 meeting, finding instead that SAC Bedwell's own response excused Plaintiff's otherwise unprofessional

14

actions.  *Id.*

Plaintiff timely filed this federal district court case on February 3, 2004, within 30 calendar days of the date on which the Initial Decision became final, as required by 5 U.S.C. § 7703(b)(2).  Def.'s Stmt. of Mat. Facts ¶ 24; Pl.'s Response to Def.'s Stmt. ¶ 24.

> H.      *Plaintiff's Affirmative Defenses and Allegations of Race and Gender-Based Discrimination and Hostile Work Environment*

In an effort to justify her post-October 2000 actions, Plaintiff contends that (1) her removal was motivated by discrimination based upon her race (African-American) and her gender (female), and upon retaliation for having engaged in EEO activity; and (2) she was subjected to a hostile work environment based on race and gender.  Plaintiff initially contacted an EEO counselor to complain about a hostile work environment based on race and gender after she had commenced her leave of absence with the FDIC on November 9, 2000, Def.'s Stmt. of Mat. Facts ¶ 25; Pl.'s Response to Def.'s Stmt. ¶ 25, although she brought up certain issues regarding the treatment of women and minorities in the Atlanta OIG office with AIGI Samuel Holland when he visited the office on September 29, 2000.  *See* AR Tab 18 (Pl.'s Admin. Hr'g Test.), at 145-47.

Paragraph 10 of Plaintiff's First Amended Complaint alleges thirteen events that comprise the backbone of Plaintiff's claims.  *See* First Am. Compl. ¶ 10.

> 1.      Plaintiff contends that she "was ridiculed by her supervisor because she attended the Women in Federal Law Enforcement Conference ("WIFLE") in Washington, D.C. *Id.* ¶ 10.  In discovery, Plaintiff identified that supervisor as Mike Mitchell, who retired from federal service in 1996.  Def.'s Stmt. of Mat. Facts ¶ 26; Pl.'s Response to Def.'s Stmt. ¶ 26.  Plaintiff stated that the incident took place sometime in 1992.  *Id.*

2.     Plaintiff asserts that she "was subject to unwanted and continuing conversations about her supervisor's divorce and sexual dysfunction." First Am. Compl. ¶ 10. In discovery, Plaintiff once again identified Mike Mitchell as the subject of this complaint, and stated that the Mitchell's divorce proceedings occurred around 1993-1994. Def.'s Stmt. of Mat. Facts ¶ 27; Pl.'s Response to Def.'s Stmt. ¶ 27.

3.     Plaintiff alleges that she "was asked to assist her manager in going to the restroom by holding his genitals for him." First Am. Compl. ¶ 10. In discovery, Plaintiff identified the manager in question as Mike Mitchell, and stated that the incident is alleged to have taken place during baton training in 1995 or early 1996. Def.'s Stmt. of Mat. Facts ¶ 28; Pl.'s Response to Def.'s Stmt. ¶ 28.

4.     Plaintiff avers that she "was forced to listen to sexist remarks about a female co-worker, including comments that this co-worker's 'legs flew open' at the sight of a photograph of her abusive husband." First Am. Compl. ¶ 10. In discovery, Plaintiff identified the source of these remarks as Mike Mitchell, and noted that the incident took place sometime in 1996. Def.'s Stmt. of Mat. Facts ¶ 29; Pl.'s Response to Def.'s Stmt. ¶ 29.

5.     Plaintiff states that she "was shocked when her supervisor tricked her into picking up a troll-like doll designed so that a large penis fell from under the shirt when she picked it up." First Am. Compl. ¶ 10. In discovery, Plaintiff once again identified Mike Mitchell as the source of this "prank," and alleged that the incident took place sometime in 1995. Def.'s Stmt. of Mat. Facts ¶ 30; Pl.'s Response to Def.'s Stmt. ¶ 30.

6.     Plaintiff explains that she "was singled out for rude, condescending and often accusatory comments from a supervisor who showed no respect for women or blacks, unless they were in a higher graded position than he." First Am. Compl. ¶ 10. In discovery, Plaintiff stated that these comments occurred around the time of the 1996 departure of Mike Mitchell from the Agency. Def.'s Stmt. of Mat. Facts ¶ 31; Pl.'s Response to Def.'s Stmt. ¶ 31.

7.     Plaintiff notes that her "supervisor repeatedly subjected her to intrusive and embarrassing inquiries about personal and medical privacy for no reason other than curiosity, including inquiries of other female employees regarding her medical condition. When she objected to this treatment she was subjected to angry tirades and told that she was 'hypersensitive' and that her supervisor did not care to have these discussions with her." First Am. Compl. ¶ 10. In discovery, Plaintiff stated that these incidents occurred sometime in March 1998. Def.'s Stmt. of Mat. Facts ¶ 32; Pl.'s Response to Def.'s Stmt. ¶ 32.

8.      Plaintiff contends that she "was subjected to unjustly reduced performance
        rating[s], mostly recently on her October 2000 performance evaluation.  When she
        objected to the ratings given her, and therefore refused to sign the Performance
        Plan, she was subjected to angry threats from her supervisor."  First Am. Compl.
        ¶ 10.  In her October 2000 performance rating, Plaintiff received a 2.7 rating out
        of a possible rating of 3.0.  Def.'s Stmt. of Mat. Facts ¶ 36; Pl.'s Response to
        Def.'s Stmt. ¶ 36.  Plaintiff's 2.7 rating was the second highest rating in the office
        that year.  *Id.*  Plaintiff also received a $1,500.00 performance award for the 1999-
        2000 performance cycle by the same supervisor, Dana Bedwell.  *Id.*

9.      Plaintiff asserts that she "was subjected to sexist comments in the work place,
        including a statement by her supervisor to the Atlanta Regional Agent staff, which
        at this point was about 12 (twelve) white men and Ms. Vickers to the effect, 'hey,
        we're all men here.'"  First Am. Compl. ¶ 10.  Plaintiff, in discovery, alleged that
        this event took place sometime in 1999.  Def.'s Stmt. of Mat. Facts ¶ 33; Pl.'s
        Response to Def.'s Stmt. ¶ 33.

10.     Plaintiff alleges that she "was subjected to constant derogatory comments made
        towards women and minorities, such as a comment that was made during the
        week of October 15, 2000, that a baton is a good weapon to use, but depending on
        the circumstances a gun is a better weapon because it eliminates problems, 'like
        the Rodney King case.'" First Am. Compl. ¶ 10.  Plaintiff identified the source of
        these comments as an instructor employed by the Federal Law Enforcement
        Training Center during discovery.  Def.'s Stmt. of Mat. Facts ¶ 37; Pl.'s Response
        to Def.'s Stmt. ¶ 37.

11.     Plaintiff avers that she "was subjected to racial profiling jokes including a
        comment that a while male could enter their building unchallenged because 'he
        didn't fit the profile.'" First Am. Compl. ¶ 10.  In discovery, Plaintiff noted that
        this comment took place sometime in 1998.  Def.'s Stmt. of Mat. Facts ¶ 34; Pl.'s
        Response to Def.'s Stmt. ¶ 34.

12.     Plaintiff claims that she "was subjected to insulting comments about affirmative
        action when an African-American was selected for a position and her white co-
        workers suggested that he had been selected only because of his race."  First Am.
        Compl. ¶ 10.  During discovery, Plaintiff alleged that this incident took place in
        1998, and explained that she overheard these remarks from behind a closed door
        when she was standing in the office hallway.  Def.'s Stmt. of Mat. Facts ¶ 38;
        Pl.'s Response to Def.'s Stmt. ¶ 38.

13.     Finally, Plaintiff states that she "was singled out for a requirement to provide
        inordinate amounts of medical information to support requests for leave."  First
        Am. Compl. ¶ 10.  However, during discovery, Plaintiff failed to specify any

information to support this allegation.  Def.'s Stmt. of Mat. Facts ¶ 35; Pl.'s
Response to Def.'s Stmt. ¶ 35; *see also* Def.'s Mot. for Summ. J., Ex. B (Pl.'s
Ans. to Interrogs. No. 1) at 22 (stating only that "[o]thers were able to take leave
by submitting a short note").

As a result of these alleged violations, which Plaintiff contends colored her tenure at the

Agency and provided the impetus to her ultimate termination, Plaintiff requests that this Court

issue an order directing that (1) the Agency refrain from any future acts of discrimination and/or

retaliation against her; and that she be (2) retroactively reinstated to her employment with the

FDIC's OIG as of the date of December 14, 2001; (3) awarded compensatory damages of

$300,000.00 for each violation plus interests thereon; (4) awarded back pay; (5) provided the

costs of bringing and maintaining this action, and reasonable attorney's fees; and (6) any other

further relief as the interests of justice may require.  *See* First Am. Compl. at 8 (Prayer for

Relief).

## II: LEGAL STANDARDS

A.    *Appeal of the MSPB's Relevant Determinations Made Pursuant to the Civil
      Service Reform Act of 1978*

The Civil Service Reform Act of 1978 ("CSRA"), Pub. L. No. 95-454, 92 Stat. 1111

(codified as amended in sections of 5 U.S.C. (2004)), provides that the final decisions of the

MSPB are generally reviewable in the Court of Appeals for the Federal Circuit.  *See* 5 U.S.C. §

7703(b)(1) (1998).  However, the CSRA creates an exception to this general rule for "[c]ases of

discrimination."  *Id.* § 7703(b)(2).   Such cases include those in which an employee "alleges that

a basis for the action was discrimination prohibited by [Title VI] . . . ."  *Id.* § 7702(a)(1)(B).

"Mixed cases" – i.e., ones such as Plaintiff's present action involving (1) a personnel action that

is otherwise appealable to the MSPB under the CSRA *and* (2) an allegation that the basis for the

action was discrimination prohibited by Title VII – may be appealed to the federal district court. *Id.* § 7703(b)(2) & (c); *see Barnes v. Small*, 840 F.2d 972, 978-79 (D.C. Cir. 1988); *Hayes v. Gov't Printing Office*, 684 F.2d 137, 139 (D.C. Cir. 1982); *Meehan v. U.S. Postal Serv.*, 718 F.2d 1069, 1073-74 (Fed. Cir. 1983).

When faced with a "mixed case," "the nondiscrimination findings of the MSPB Administrative Law Judge are reversible only if they were arbitrary or capricious, obtained without lawful procedures, or were unsupported by substantial evidence." *Roundtree v. Johanns*, 382 F. Supp. 2d 19, 31-32 (D.D.C. 2005) (citing 5 U.S.C. § 7703(c); *Barnes*, 840 F.2d at 979; *Butler v. West*, 164 F.3d 634, 639 n.10 (D.C. Cir. 1999)). In contrast, the plaintiff's affirmative defenses that she was terminated on the basis of discrimination or retaliation are reviewed *de novo*. *See* 5 U.S.C. § 7702(e)(3).

The court reviews the nondiscrimination claims on the administrative record alone. *Barnes*, 840 F.2d at 979 (citations omitted). Insofar as the Administrative Law Judge's findings are based upon credibility assessments, these findings are "virtually unreviewable," and a plaintiff's *de facto* request for the Court to "re-weigh conflicting evidence" is inconsistent with the reviewing court's function. *Roundtree*, 382 F. Supp. 2d at 32 (quoting *Bieber v. Dep't of the Army*, 287 F.3d 1358, 1364 (Fed. Cir. 2002)). Further, in assessing whether the MSPB's ruling was supported by substantial evidence, the court is limited to determining "whether the agency . . . could fairly and reasonably find the facts that it did," and "[a]n agency conclusion may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view." *Robinson v. NTSB*, 28 F.3d 210, 215 (D.C. Cir. 1994) (internal quotation marks and citations omitted); *see also Willingham v. Gonzalez*, 391 F. Supp.

19

2d 52, 64 (D.D.C. 2005); *Roundtree*, 382 F. Supp. 2d at 32.

An agency is justified in taking an adverse employment action such as suspension or removal "only for such cause as will promote the efficiency of the service."  5 U.S.C. § 7513(a). "As the case law has developed, courts have framed the 'efficiency of the service' issue in terms of requiring a 'nexus' between . . . 'the articulated grounds for an adverse personnel action and either the employee's ability to accomplish his or her duties satisfactorily or some other legitimate government interest promoting the 'efficiency of the service.'" *Yacovone v. Bolger*, 645 F.2d 1028, 1032 (D.C. Cir. 1981) (quoting *Doe v. Hampton*, 566 F.2d 265, 272 (D.C. Cir. 1977) (internal quotations omitted)).  "This requirement has been translated into a three-part test in which the agency must prove by a preponderance of the evidence that:  (1) the charged conduct occurred; (2) there is a nexus between the conduct and the efficiency of the service; and (3) the penalty imposed is reasonable." *Willingham*, 391 F. Supp. 2d at 64 (citing *Pope v. U.S. Postal Serv.*, 114 F.3d 1144, 1147 (Fed. Cir. 1997)).

> **B.**    *Motion for Summary Judgment Pursuant to Rule 56 of the Federal Rules of Civil Procedure*

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).  Under the summary judgment standard, Defendant, as the moving party, bears the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a

20

genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91

L.Ed.2d 265 (1986).  Plaintiff, in response to Defendants' motion, must "go beyond the pleadings

and by [his] own affidavits, or depositions, answers to interrogatories, and admissions on file,

'designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal

citations omitted).

     Although a court should draw all inferences from the supporting records submitted by the

nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar

summary judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91

L.Ed.2d 202  (1986).  To be material, the factual assertion must be capable of affecting the

substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient

admissible evidence that a reasonable trier-of-fact could find for the nonmoving party.

*Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at

251, 106 S.Ct. 2505 (the court must determine "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative,

summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50, 106 S.Ct. 2505

(internal citations omitted).  "Mere allegations or denials in the adverse party's pleadings are

insufficient to defeat an otherwise proper motion for summary judgment." *Williams v.

Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996).  The adverse party must do more than simply

"show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus.

Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  Instead,

while the movant bears the initial responsibility of identifying those portions of the record that

demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant

to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587,

106 S.Ct. 1348 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

Importantly, "[w]hile summary judgment must be approached with specific caution in

discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by

affidavits or other competent evidence showing that there is a genuine issue for trial." *Morgan v.*

*Fed. Home Loan Mortgage Corp.*, 172 F. Supp. 2d 98, 104 (D.D.C. 2001) (quoting *Calhoun v.*

*Johnson*, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998) (internal citation

omitted), *aff'd*, No. 99-5126, 1999 WL 825425, at *1 (D.C. Cir. Sept. 27, 2000)); *see also*

*Marshall v. James*, 276 F. Supp. 2d 41, 47 (D.D.C. 2003) (special caution "does not eliminate

the use of summary judgment in discrimination cases") (citing cases). "Summary judgment is

not a 'disfavored procedural shortcut,' but is an integral procedural tool which promotes the

speedy and inexpensive resolution of every case." *Marshall*, 276 F. Supp. 2d at 47 (quoting

*Celotex Corp.*, 477 U.S. at 327). Accordingly, the Court reviews the defendant's motion for

summary judgment under a "heightened standard" that reflects "special caution." *Aka v.*

*Washington Hosp. Ctr.*, 116 F.3d 876, 879 (D.C. Cir. 1997) (internal quotations omitted),

overturned on other grounds, 156 F.3d 1284 (D.C. Cir. 1998) (en banc). Nonetheless, while this

special standard is more exacting, it is not inherently preclusive. Although more circumspect, the

Court will continue to grant a motion for summary judgment in which the nonmoving party has

failed to submit evidence that creates a genuine factual dispute and the moving party is entitled to

a judgment as a matter of law.

## III: DISCUSSION

Plaintiff's suit rests upon two central claims.  First, Plaintiff contends that the MSPB Administrative Law Judge's decision upholding her termination was arbitrary, capricious, and an abuse of discretion under the standards set out in the CSRA.  Second, Plaintiff asserts that during her time at the Agency, she was discriminated against on the basis of her race and gender, subjected to a hostile work environment, and retaliated against for complaining of past discrimination in violation of Title VII.  The Court shall deal with each argument in turn.

    *A.*    *Reviewing the MSPB Administrative Law Judge's Determination Upholding Plaintiff's Termination*

Given that Plaintiff's action before the Court represents the quintessential "mixed case," in order to overturn the MSPB Administrative Law Judge's ("ALJ") ruling sustaining her termination – the nondiscrimination aspect of Plaintiff's case – Plaintiff must overcome the deference provided to the ALJ and establish that the ALJ's findings were arbitrary or capricious, obtained without lawful procedures, or were unsupported by substantial evidence.  *Roundtree*, 382 F. Supp. 2d at 31-32; 5 U.S.C. § 7703(c).  In her Initial Decision, the ALJ affirmed the two out of the three charges brought by the Agency: (1) the ALJ sustained as modified the Agency's charge that Plaintiff failed to cooperate in her medical examination, Def.'s Stmt. of Mat. Facts ¶ 18 n.16; Pl.'s Response to Def.'s Stmt. ¶ 18; and (2) the ALJ affirmed the Agency's charge that Plaintiff failed to follow instructions through (a) her failure to provide SAC Bedwell with information that he requested about her cases during the October 31, 2000 meeting, and (b) her failure to return to the PHS after having been directed to do so by SAC McDade's April 18, 2001 letter.  *Id.*  With respect to Plaintiff's affirmative defense that her termination was the result of

23

discrimination and retaliation, which this Court reviews *de novo*, *see* 5 U.S.C. § 7702(e)(3), the

ALJ concluded that (1) Plaintiff "presented no direct evidence that reflects directly the

discriminatory attitude [about which she complained] and bears directly on her removal," Initial

Desc. at 13 (emphasis in original); and (2) Plaintiff presented no credible evidence linking her

removal with any possible retaliatory animus, *id.* at 17-18.  The Court shall examine each finding

by the ALJ against Plaintiff in sequence under the relevant legal standards.

### 1.   Failure to Cooperate With the Medical Examination

The ALJ found that "[Plaintiff's] refusal to sign the medical release section on the Exam

Form precluded the Agency from completing the physical examination [of Plaintiff], scheduling

[her] psychological evaluation, and achieving an independent examination as to [Plaintiff's]

ability to return to her law-enforcement position."  *Id.* at 11.[2]  As such, the ALJ concluded that

Plaintiff's failure to cooperate impacted the efficiency of the service because "[e]mployees are

expected to respect authority and follow the proper orders of superior officials."  *Id.* at 22 (citing

*L'Bert v. Veteran's Admin.*, 88 M.S.P.R. 513, 522 (2001).  Upon a consideration of the available

penalties and Plaintiff's actions, the ALJ found that the penalty of removal was reasonable in

these circumstances.  *Id.* at 23-25.

---

[2] Because the Authorization for Disclosure of Information Form did contain some blanks, and AIGI Holland testified that "he would not order an employee to sign a form that did not say to whom the information would be released," the ALJ did not sustain the charge against Plaintiff on that form.  *See* Initial Desc. at 10-11 (but sustaining the Exam Form charge).  However, the ALJ did note that "it is most likely that [Plaintiff] would also have refused to complete a filled-in Authorization Form . . . ."  *Id.*  Due to the fact that the ALJ did not sustain the Authorization Form charge, the Court shall only deal with the merits of the charge sustained against Plaintiff – i.e., failure to sign the Exam Form medical release.

In response to the ALJ's findings on this issue, Plaintiff takes a two-fold approach.  First, Plaintiff contends that she "fully complied with the medical examination, did not withhold any pertinent medical history, and offered to sign a properly completed medical release form."  Pl.'s Opp'n at 24.  Plaintiff notes that she consistently supplied documentation to the Agency when requested during her leave period, *id.* (noting that she provided a doctor's note and reports from two treating providers), went to the PHS as instructed on April 9, 2001, and withstood major delays, taking great effort to comply with the PHS's needs and the requirements of her eye test, *id.*  Further, Plaintiff emphasizes that she answered every question posed to her by the medical examiners despite no advance warning about what tests she was required to take or the scope of the examination itself.  *Id.* at 25.  Plaintiff also stresses that she returned to the PHS on April 10, 2001, spending another two and one-half hours there (for a total of roughly twelve hours) before leaving.  *Id.* at 25-26.

Second, Plaintiff admits that she refused to sign the medical waiver presented to her because (1) it did not identify the party to whom the records could be released, *id.* at 25, and (2) because she did not know which of her medical issues the medical examination was supposed to address, she could not guess who would have access to her records, *id.*  Plaintiff contends that her non-compliance is justified due to the fact that following the order would cause her "irreparable harm."  *Id.* at 26.  According to Plaintiff, "'public disclosure of highly personal confidential information, the likes of which are at issue in this case, result[s] in a harm that is both substantial and irreversible.'"  *Id.* (quoting *Hirschfeld v. Stone*, 193 F.R.D. 175, 187, 192 (S.D.N.Y. 2000) (holding that disclosure of personal medical information contained in inmates' files would cause irreparable harm to inmates, outweighing the state's interest in including the

information in court reports)).  Plaintiff argues that the flaws with the medical release itself

"violat[ed] federal regulations," *id.* at 27 (citing 5 C.F.R. § 339.303(a) (requiring an agency to

"inform the employee in writing of its reasons for [ordering a medical evaluation] and the

consequences of failure to cooperate"), and could have led to her medical history and condition

becoming the subject of hurtful office gossip.  *Id.* at 27-28 (noting that the rape of a colleague

was a topic of office discussion, and providing testimony that Plaintiff was concerned about her

medical information being shared within the office).

Upon a review of the administrative record, the Court concludes that the ALJ's decision

sustaining the charge that Plaintiff failed to cooperate with the medical examination was not

arbitrary, capricious, or contrary to law; rather, the ALJ's decision on this point was supported by

substantial evidence in the record.  Indeed, the ALJ's decision properly considered *L'Bert*, 88

M.S.P.R. at 517 (sanctioning disciplinary action against employee for failure to cooperate in

agency-ordered examination where the agency is authorized to so order); 5 C.F.R. §

339.301(b)(3) (authorizing agency to require employee who occupies a position with medical

standards or physical requirements to report for medical examination when a question arises

concerning the employee's "continued capacity" to meet the physical and medical requirements

of the position); and 5 C.F.R. §§ 339.202 & 203 (authorizing agency to offer medical

examination where agency needs additional medical documentation to make an informed

management decision, documents its reason for offering examination, and informs the employee

in writing of its reasons for doing so and the consequences of failing to cooperate).

Here, the ALJ correctly considered that Plaintiff's law enforcement position – "Criminal

Investigator" – had medical standards approved by the OPM, and that those standards required

Criminal Investigators to be free of mental or emotional instabilities that inhibit the performance

of law enforcement duties, including using firearms.  Initial Desc. at 9.  The ALJ noted that

Plaintiff had requested to be absent from the workplace for six months to seek treatment for a

major depressive disorder, and that AIGI Holland testified that he wanted an independent

evaluation of Plaintiff's ability to return to work because she carried a weapon, which could

impact her safety and the safety of others.  *Id.*  Accordingly, the Agency certainly presented

sufficient and substantial evidence supporting its request for a medical examination of Plaintiff

prior to her return to the Agency.  *See* 5 C.F.R. § 339.301(b)(3).

Moreover, the Agency presented substantial evidence showing that it complied with the

requirement that it inform Plaintiff of the reasons for the examination and the possible penalties

for noncompliance.  *See* 5 C.F.R. §§ 339.202 & 203.  Through a March 23, 2001 letter from SAC

Bedwell, the Agency communicated to Plaintiff directly and in writing the requirement that she

have a medical examination prior to her return to work; that her position was subject to

mandatory medical standards; that 5 C.F.R. § 339.301 authorized the FDIC to require her to

report for the examination; and that "[f]ailure to these appointments and submit to the required

examinations will result in disciplinary action up to and including removal."  Def.'s Stmt. of

Mat. Facts ¶ 11; Pl.'s Response to Def.'s Stmt. ¶ 11; Initial Desc. at 6.  The Agency followed up

this detailed writing with another letter on April 18, 2001, when Acting SAC McDade notified

Plaintiff that the PHS had informed him that, on the advice of her counsel, Plaintiff had refused

to sign and complete the medical release forms.  Def.'s Stmt. of Mat. Facts ¶ 15; Pl.'s Response

to Def.'s Stmt. ¶ 15; Initial Desc. at 7-8.  Acting SAC McDade further advised Plaintiff that

"[w]ithout your input and signature on this form, the attending PHS physician is unable to

27

complete [the] diagnostic and physical findings portions of the form," and that "the needed

psychiatric evaluation can not take place until the completion of the physical examination

process." *Id.* As such, Acting SAC McDade emphasized to Plaintiff that (1) without that

information, the evaluation process to determine her ability to return to work and perform the

essential functions of her position was incomplete; (2) she was directed to return to the PHS by

April 20, 2001, to complete and sign the requisite releases; (3) such task would not require a

special appointment; and (4) failure to complete the forms would be grounds for disciplinary

action up to and including removal. *Id.* When Plaintiff again failed to comply with this

directive, Employee Relations Specialist Janet Welsh specifically advised Plaintiff's lawyer on

April 24, 2001, that her failure to complete the medical release forms constituted a failure to

complete the physical examination process and – as a result – Plaintiff would be subject to

disciplinary action up to and including removal. Initial Desc. at 8 (citing Agency Response, Tab

4(l) and specifically noting that a copy of that letter was sent to Plaintiff).

Accordingly, it is clear that, given Plaintiff's sensitive position, the Agency had every

right to require a medical examination using the independent physicians at the PHS to evaluate

Plaintiff before allowing her to return to work. *See* 5 C.F.R. § 339.301(b)(3). Moreover,

contrary to Plaintiff's assertion that the notices were somehow insufficient, the Agency followed

all of the steps necessary to ensure proper notice, making sure to document its reasons for

demanding the examination, informing Plaintiff in writing its reasons for doing so, and

highlighting the consequences of noncompliance for Plaintiff. *See* 5 C.F.R. §§ 339.202 & 203.

Likewise, it is undisputed that Plaintiff failed to execute the medical release on the Exam Form;

while Plaintiff certainly did make significant efforts in complying with portions of the medical

examination, her clear refusal on this point brought the evaluation process to a halt.  Def.'s Stmt.

of Mat. Facts ¶¶ 13, 16; Pl.'s Response to Def.'s Stmt. ¶¶ 13, 16; Initial Desc. at 10.  As such, the

Agency certainly established through substantial evidence that Plaintiff failed to fully cooperate

in the medical examination process and failed to follow the instructions of her supervisors, and

that this misconduct impacted the efficiency of the service.  Initial Desc. at 22 ("[e]mployees are

expected to respect authority and follow the proper orders of supervisory officials") (citing

*L'Bert*, 88 M.S.P.R. at 522).

However, Plaintiff has one central affirmative defense to her noncompliance:  she

believed that signing the medical releases would cause her "irreparable harm" in the form of

invasion of privacy because the waiver presented to her allegedly (1) did not identify the party to

whom the records could be released, *id.* at 25, and (2) because she did not know which of her

medical issues the medical examination was supposed to address, she could not guess who would

have access to her records, *id.*  Upon a review, it is clear that the ALJ properly considered the

evidence before her and rightfully rejected Plaintiff's excuse for not signing the Exam Form

medical release.  Importantly, the Exam Form medical release that Plaintiff refused to sign stated,

as follows:

> I certify that I have reviewed the foregoing information supplied by me and that it
> is true and complete to the best of my knowledge.  I authorize any of the doctors,
> hospitals, or clinics mentioned on these forms to furnish the Government a
> complete transcript on my medical record for purposes of processing this exam.  I
> authorize the release of all medical information to the Federal Occupational
> Health/Law Enforcement Medical Program and on a need to know basis, the
> designed [sic] (Agency/Name) point of contact.

Initial Desc. at 6-7 (citing Agency Response, Tab 4(g)(2), Ex. 4 to Hr'g Tr.).

The ALJ accurately observed that "the Exam Form release identified only those doctors, hospitals or clinics [that Plaintiff had] mentioned in answering the questions on the form as the individuals to whom she would be authorizing to release a complete transcript of her medical record 'for purposes of processing the exam.'" *Id.* at 10.  Indeed, the form authorized release of her medical information only "to the agency's designated point of contact on a need-to-know basis." *Id.*  The ALJ found Plaintiff's stated objection to completing the Exam Form in April 2001 "particularly troubling because, without incident, she previously signed the release on the Exam Form on January 21, 2000." *Id.*  Upon a review of the administrative record, it is clear that there is a major difference between the Authorization for Disclosure of Information Form, a form which did contain some blanks and for which the ALJ did not sustain the charge against Plaintiff, and the Exam Form medical release.  Plaintiff's affirmative defenses apply only to the Authorization Form, not the Exam Form.  The Exam Form was a perfectly valid form that Plaintiff wrongly refused to sign.  As such, while she did cooperate with a portion of the agency's physical examination, Plaintiff failed to cooperate in all of the medical examination and prevented the agency from accomplishing its goal of receiving the independent evaluation of Plaintiff's ability to perform law enforcement work.  *Id.*  The Court concludes that the ALJ's finding in this area was therefore neither arbitrary nor capricious, and it was plainly supported by substantial evidence.

2.    Failure to Follow Instructions

The ALJ also sustained a second, two-pronged charge by the FDIC against Plaintiff that she had failed to follow instructions because (1) she had failed to follow SAC Bedwell's instructions on October 31, 2000, to provide him with specific information on the status of her

30

pending cases; and (2) she refused to follow Acting SAC McDade's instructions in his April 18, 2001 letter to return to the PHS to complete the medical history and release forms by the close of business on April 20, 2001.  Initial Desc. at 11-13.  The Court shall analyze each prong of the charge in turn.

    i.  *Failure to Follow SAC Bedwell's Instructions on October 31, 2000*

  The ALJ's decision found that Plaintiff had failed to follow SAC Bedwell's instructions on October 31, 2000 in two respects: (1) Plaintiff failed to "explain why she was planning to travel to Columbia," South Carolina; and (2) Plaintiff did not provide an estimate of "the number of interviews to be conducted in the Adams investigation."  *Id.* at 11.  Plaintiff asserts that the ALJ's decision in this area is not supported by substantial evidence.  Pl.'s Opp'n at 29.  First, Plaintiff emphasizes that during his testimony before the ALJ, SAC Bedwell recalled that Plaintiff did actually respond to his question regarding Columbia, South Carolina, by stating that "she needed to meet the FBI agent who was assigned to the case."  *Id.* at 29-30 (citing AR, Tab 18 (Bedwell Admin. Hr'g Test.), at 25).  Second, Plaintiff claims that the evidence adduced indicates that "other than the exact number of interviews that she needed to do in the Adams case, [Plaintiff] answered Mr. Bedwell's work-related questions."  *Id.* at 29.  In excusing this failure, Plaintiff stresses that because SAC Bedwell had just noted that Plaintiff "exceeds expectations" on a performance evaluation earlier that month, "the exact number of interviews that she had to complete was not a valid concern."  *Id.*  Indeed, Plaintiff points out that on this performance evaluation, SAC Bedwell specifically noted that Plaintiff "continues to keep her supervisor informed of key developments concerning investigative assignments to her."  *Id.* at 30 (citing AR, Tab 18 (Bedwell Admin. Hr'g Test.), at 54).  Even more importantly, Plaintiff also

emphasizes that – as SAC Bedwell agreed in his testimony – she offered to get the Adams case file and count exactly how many interviews she needed to conduct, but SAC Bedwell refused the offer.  *Id.* at 29 (citing AR, Tab 18 (Bedwell Admin. Hr'g Test.), at 26).

Upon a review of the administrative record and the evidence contained therein, the Court concludes that the ALJ's finding that Plaintiff "failed to follow Bedwell's instructions on October 31, 2001 to provide him with specific information on the status of her pending cases" is not supported by substantial evidence.  Rather, Plaintiff is accurate:  SAC Bedwell indicated that Plaintiff responded to his question concerning the point of her trip to Columbia, South Carolina, and while Plaintiff lacked the materials to respond in full to his question regarding the exact number of interviews in the Adams case, Plaintiff made her willingness to locate the answer to that question quite evident.  Accordingly, Plaintiff cannot be characterized as refusing to follow SAC Bedwell's instructions on October 31, 2000, despite the unfortunate tone of the meeting and the events that followed.  The Court shall therefore vacate and reverse the ALJ's finding as to the first component of the Agency's "failure to follow instructions" charge.

ii. *Failure to Follow Acting SAC McDade's April 18, 2001 Instructions*

The ALJ also sustained the "failure to follow instructions" charge against Plaintiff on the grounds that she was given instructions by Acting SAC McDade through his April 18, 2001 letter to report to the PHS by April 20, 2001 to complete the requisite releases, and she admittedly failed to follow those instructions; moreover, the ALJ found that "there is no credible evidence that [Plaintiff] could not have complied with the instructions."  Initial Desc. at 12.  Plaintiff's central defense against her admitted failure to follow the instructions to report is that she "did not

32

receive the order in time to comply." Pl.'s Opp'n at 30. Plaintiff contends that she did not

become aware of the order until she discovered the letter on April 20, 2001, and – at that point –

she could not arrange childcare. *Id.* As such, Plaintiff asserts that "through no fault of her own,

it was impossible . . . to attend the examination and comply with the instructions." *Id.*

Upon a review of the evidence included within the administrative record, the Court finds

that the ALJ's decision (1) finding that Plaintiff did not comply with the instructions and (2)

rejecting Plaintiff's excuses was supported by substantial evidence, and was neither arbitrary nor

capricious. The ALJ reasoned, accurately, that Plaintiff did not need an appointment with the

PHS to undertake the task; rather, all she had to do was sign her name to the documents. The

ALJ also appropriately noted that Plaintiff had failed to explain "why, if she truly wanted to sign

the release forms, she could not have brought her child with her to accomplish her signature,"

Initial Desc. at 12, and that "[m]ore importantly, [Plaintiff] did not make any attempt to call the

agency and ask for an extension of time to sign the release," *id.* Further, the ALJ also had

substantial evidence to support her findings that "throughout the processing of her disciplinary

action, [Plaintiff] never made any attempt to sign the releases," *id.*, and her "attorney's April 27th

letter continued to voice [Plaintiff's] refusal to sign any medical release" such that it did "not

express regret for missing the agency's deadline to submit," *id.*; *see also* AR, Tab 7 (April 27,

2001 Letter from Joleen Payeur Olsen, Plaintiff's counsel, to Janet Welch, FDIC Employee

Relations Specialist) at 4. Given these well-supported considerations, the Court concludes that

the ALJ's finding that "there is no credible evidence that [Plaintiff] could not have complied with

the instructions, and that [Plaintiff] failed to follow those instructions" was based on substantial

evidence. The ALJ also appropriately found that – based on substantial evidence in the record

33

and in accordance with applicable law – there was a direct relationship between that misconduct and the efficiency of the service. *Id.* at 22 (citing *L'Bert*, 88 M.S.P.R. at 522 ("[e]mployees are expected to respect authority and follow the proper orders of supervisory officials").

      3.    Propriety of Removal

Plaintiff next contends that the ALJ's decision sustaining her removal by the Agency was arbitrary and capricious because "the Agency's penalty in this case is out of line with Board decisions." Pl.'s Opp'n at 30. Upon a review of the relevant facts and the ALJ's reasoning, the Court concludes that the ALJ's decision to sustain Plaintiff's removal was neither arbitrary nor capricious; rather, it was a difficult decision supported by substantial evidence in the record.

First, the ALJ properly found that, in imposing the removal, the Agency had considered all relevant factors and exercised management discretion within tolerable limits of reasonableness. Initial Desc. at 27. The ALJ placed great emphasis on the credible testimony of AIGI Holland, who testified that (1) it was important for a Special Agent to obey and follow orders; (2) Plaintiff was examined because she left work suffering from depression, she carried a weapon, and he wanted to determine that she would be able to perform her duties before returning to work; (3) he was concerned for the safety of Plaintiff, the public, and Plaintiff's colleagues, as well as potential liability for the Agency given Plaintiff's recent depressive disorder; (4) in making his removal decision, he had considered, as mitigating factors, Plaintiff's length of service, her performance appraisals and lack of prior disciplinary action, as well as her medical condition of depression, and balanced against those factors the seriousness of Plaintiff's misconduct, the absence of rehabilitation potential, the absence of any indication that – if she returned – Plaintiff would be a reliable employee, and the absence of remorse on Plaintiff's part.

*Id.* at 23 (noting that the Agency took into account the factors discussed in *Douglas v. Veterans Admin.*, 5 M.S.P.R. 280 (1981)).   The ALJ also considered, in connection with the reasonableness of the remedy, AIGI Holland's testimony that this had not been an easy decision for him to make due to Plaintiff's years of service, but he felt that her refusal to complete the examination and lack of remorse gave him no choice but to remove her.   *Id.*

Second, the ALJ accurately noted the significant consequences of Plaintiff's refusal to follow orders and complete the medical examination.   Based upon the record, it is clear that the ALJ correctly found that "[d]espite being told on several occasions that she could be removed for failure to complete the medical examination," *id.*, i.e., with SAC Bedwell's March 23, 2001 letter and Acting SAC McDade's April 18, 2001 letter, Plaintiff "still refused to sign the medical release form whereby the agency could have verified the oral information that she provided during her medical history was accurate."   *Id.*   Indeed, without this verification, the Agency could not truly evaluate the potential danger with respect to Plaintiff's return to the workplace or her fitness for duty.   The ALJ also properly reasoned that "[t]o the extent that [Plaintiff] was concerned that Mr. Bedwell would receive her medical information, her claim is completely unfounded because he retired in March 2001, and she testified that she had no problem with his replacement, Mr. McDade."   *Id.*   Upon a review of the relevant evidence, the Court also finds that the ALJ correctly pointed out that Plaintiff had failed to identify any other management officials whom she believed that she could not trust to keep her medical records private, and that her "claim that no one told her the reason for the examination is without merit, as the reason and authority for the examination was set out with particularity in the letters dated March 23 and April 18, 2001, as well in other communications to her/her attorney."   *Id.*; *see also* Agency

35

Response, Tabs 4(o), 4(n), & 4(I).  Indeed, with an opportunity to personally witness Plaintiff's

testimony, the ALJ found that "[a]lthough [Plaintiff] tried to appear remorseful during the

hearing, I found her testimony to be disingenuous" because, despite her claims, "one of the

medical release forms was not blank, she had signed it the year before, and she was advised three

times that she could be fired if she did not complete her medical examination, including signing

the form."  *Id.*; *see also Roundtree*, 382 F. Supp. 2d at 32 (insofar as the ALJ's findings are based

upon credibility assessments, these findings are "virtually unreviewable") (quoting *Bieber*, 287

F.3d at 1364).

Third, the ALJ's decision to uphold the termination decision was no mere "rubber

stamp."  Rather, the ALJ made the required independent evaluation and carefully weighed all

evidence before determining that

> What is clear is that, in April 2001, the appellant was engaged in a test of wills
> over affixing her signature to the release of her medical records and she felt so
> strongly about her desire to disobey the signature instruction that she left the
> agency no choice but to fire her.

*Id.* at 24.  Citing to various actions by the Agency, the ALJ properly emphasized that "[c]ontrary

to [Plaintiff's] characterization of the agency's actions as a path to remove her from her position,

the record demonstrates that the agency took every means available to avoid the harshest

disciplinary action of removal."  *Id.*  In her decision to uphold the penalty of removal, the ALJ

found that as a Criminal Investigator, Plaintiff is held to a "higher standard of behavior" with

regard to compliance with the Agency's orders, and that her blind reliance on the misguided

advice of her attorney provided no justification for her failure to follow the Agency's orders.  *Id.*

at 24-25.

36

Fourth, because law enforcement officers are generally held to higher standards of conduct that other employees due to the great trust and confidence placed in them, *see Wilson v. Dep't of Justice*, 68 M.S.P.R. 303, 310-11 (1995), many of the cases cited by Plaintiff as standards for the typical penalty are inapplicable in this context. *See* Pl.'s Opp'n at 30-33 (citing cases). Rather, law enforcement officers who fail to obey orders or instructions are usually dealt with severely. *See Ryan v. Dep't of Justice*, 950 F.2d 458, 462 (7th Cir. 1991) (upholding removal of long-term FBI agent who refused to investigate the activities of a Catholic anti-war organization due to his sincere religious beliefs because law enforcement agencies place such a high value on obedience and are entitled to insist that their agents follow orders); *Ferrone v. Dep't of Labor*, 797 F.2d 962, 966-67 (Fed. Cir. 1986) (upholding the removal of an exemplary Inspector General agent due failure to follow order); *Jones v. Dep't of Justice*, MSPB Dkt. No. AT-0752-04-0207-I-1 (Nov. 23, 2004) (upholding removal of law enforcement officer despite his long, unblemished record of service, because he refused to pay his psychiatrist $400.00 to produce the medical evidence required by the agency to justify his continued sick leave absence after approximately 60 days of treatment for depression). Moreover, neither the D.C. Circuit nor the MSPB have been forgiving of employees – particularly law enforcement employees – who fail to cooperate in fitness-for-duty examinations. *See Fogg*, 254 F.3d at 112 (upholding the removal of a deputy U.S. Marshal with 19 years of unblemished service who refused to obey what he believed to be a racially discriminatory order to undergo a medical examination); *Abatecola v. Veterans Admin.*, 29 M.S.P.R. 61 (1986) (upholding removal of employee on workman's compensation for failing to attend fitness-for-duty examination). Given these considerations, Plaintiff's allegation that her removal is somehow out-of-line with past precedent

is without foundation.

Ultimately, the Court concludes that the ALJ's decision to sustain Plaintiff's removal from the Agency was neither arbitrary nor capricious, and was instead supported by sufficient evidence. AIGI Holland gave extensive testimony regarding his decision to terminate in light of the *Douglas* factors, the ALJ conducted her own independent, even-handed analysis of the evidence, and Plaintiff's refusal to follow orders certainly carried with it significant consequences that certainly reduced the efficiency of the service. Moreover, given her delicate position as a law enforcement agent entrusted with both a weapon and the public trust, Plaintiff's refusal to follow orders was certainly a significant offense. While the Court does not believe the "refusal to follow instructions" charge can be sustained against Plaintiff as to the October 31, 2000 discussion with SAC Bedwell, the Court finds that (1) Plaintiff's failure to complete the medical examination and (2) her refusal to follow various orders in the Spring of 2001 regarding her Exam Form release were sufficient to justify her removal, in light of the evidence and considerations identified by AIGI Holland and the ALJ. Such a penalty is well in line with existing punishments and case law within this Circuit.

### 4.    Plaintiff's Affirmative Defenses

Plaintiff, during the MSPB process, claimed that her termination was actually the result of (1) impermissible race and gender discrimination, and (2) retaliation for alleged statements that Plaintiff made to AIGI Holland regarding discrimination in the workplace. *See* Initial Desc. at 13. With respect to these claims, the Court reviews the evidence *de novo*, in contrast to its analysis of the ALJ's nondiscrimination findings. *See* 5 U.S.C. § 7702(e)(3); *Roundtree*, 382 F. Supp. 2d at 31-32. Upon such a review, the Court finds both of Plaintiff's claims to be without

foundation and disproved by substantial Agency evidence.

i.    *Gender and Race Discrimination*

At the MSPB hearing, Plaintiff alleged that race and gender discrimination was the true

motivating factor behind her termination.  *See* Initial Desc. at 13.  Her claim was based on

alleged "direct evidence," for which she was required to "show that race or gender discrimination

was a motivating factor in the agency's action."  *Id.* (citing *George v. U.S. Postal Serv.*, 74

M.S.P.R. 71, 80 (1997)).  During the MSPB process, the issue of whether the same employment

decision would have been made absent the impermissible motive goes only to the issue of relief.

*Id.* (citing *Lam v. Univ. of Hawaii*, 40 F.3d 1551, 1564 & n.24 (9th Cir. 1994)).  For the purposes

of this determination, the MSPB considers direct evidence to consist of documentary or

testimonial evidence, and it may be any written or verbal statement made by an employer that

"both reflect[s] directly the alleged discriminatory attitude and bear[s] directly on the contested

employment decision."  *Id.* (citing *George*, 74 M.S.P.R. at 80; *Redschlag v. Dep't of the Army*,

89 M.S.P.R. 589, 623 n.8 (2001)).  Upon a review of the evidence relating to gender and race

discrimination presented by Plaintiff at the MSPB hearing and in her relevant submissions, the

ALJ found that Plaintiff "presented no direct evidence that reflects directly the discriminatory

attitude and bears directly on her removal."  *Id.*  The ALJ stressed that she found "that there is

simply no direct or circumstantial evidence tending to show that [Plaintiff] was removed because

of discrimination based on her gender or [race]."  *Id.* at 15.

Upon a *de novo* review of these conclusions, the Court finds that the Agency produced

substantial evidence showing that Plaintiff's termination was the result of nondiscriminatory

concerns, and that Plaintiff failed to introduce direct or circumstantial evidence showing that

discriminatory motivations impacted her removal.  Plaintiff pointed out three events that
allegedly reflect the discriminatory attitude in the OIG office and led her to conclude race and
gender-based discrimination was at the heart of her termination:  (1) she felt that she was given
extra scrutiny in her attendance and whereabouts while in the office; (2) she believed that the
appraisal system was unfair; and (3) a white male employee, Ted Martin, had a similar
confrontation with SAC Bedwell but was not punished in a similar manner.  *Id.* at 13-15; *see also*
AR Tab 18 (Ted Martin Admin. Hr'g Test.), at 203-05; AR Tab 18 (Joan Green Admin. Hr'g
Test.), at 214-15.  The Court finds that the Agency produced substantial evidence showing that
the actions at the center of Plaintiff's arguments were nondiscriminatory; moreover, Plaintiff
produced no evidence showing that the described events bore directly on her termination.

      First, with respect to Plaintiff's "extra scrutiny" claim, Joan Green – her fellow employee
at the Atlanta OIG office – testified that although SAC Bedwell did send her to locate Plaintiff,
as described by Plaintiff, SAC Bedwell also searched for males in the men's restroom and used
Ms. Green as a proxy for his typical scrutiny of all employees.  *See* AR Tab 18 (Joan Green
Admin. Hr'g Test.), at 214-15.  Moreover, Ms. Green, who was responsible for time and
attendance matters for the office at the time relevant to Plaintiff's complaints, testified that any
added scrutiny given Plaintiff was the result of Plaintiff's having been absent for health reasons
more frequently than other employees, and that SAC Bedwell's scrutiny involved his desire to
ensure that Plaintiff had all the necessary leave slips and doctors statements so that they could be
attached to the payroll form in an appropriate manner.  *Id.* at 215.  Second, with respect to
Plaintiff's complaints regarding performance appraisal, it is clear that no one in the office was
happy with the existing system.  Ted Martin, a white male employee, testified that he also

believed that the appraisal system was unfair.  *See* AR Tab 18 (Ted Martin Admin. Hr'g Test.), at

196.  Moreover, Plaintiff's most recent performance evaluation – a 2.7 out of 3.0 – represented

the second highest award in the office, and SAC Bedwell did provide her a $1,500.00

performance award bonus for the 1999-2000 performance cycle.  Def.'s Stmt. of Mat. Facts ¶ 5;

Pl.'s Response to Def.'s Stmt. ¶ 5.  Third, with respect to Plaintiff's claim that Ted Martin was

treated differently than her after an altercation with SAC Bedwell, Ted Martin's testimony at the

hearing showed that his confrontation with SAC Bedwell was quite different than Plaintiff's

October 31, 2000 discussion:  while he did raise his voice with SAC Bedwell, he was not

perceived as refusing to answer questions, nor was he accused of failing to follow instructions

and complete a medical examination.  *See* AR Tab 18 (Ted Martin Admin. Hr'g Test.) at 203-06.

Accordingly, Mr. Martin simply did not engage in misconduct similar to that of Plaintiff, making

a comparison between their respective punishments spurious at best.

In sum, Plaintiff's identified instances of discrimination were countered by substantial

evidence by the Agency showing nondiscriminatory motivations, and Plaintiff could not link her

identified discriminatory events in any direct way with her termination.  Based on a *de novo*

review of the evidence and the ALJ's findings, the Court concludes that Plaintiff cannot maintain

an affirmative defense to her discharge based on race or gender-based discrimination.

ii.     *Retaliation for Protected EEO Activity*

At the MSPB hearing, Plaintiff also alleged that her termination was also motivated by

retaliation for protected EEO activity.  Plaintiff asserted that she conducted two types of EEO

activity that impacted the Agency's decision to terminate her employment:  (1) she contended

that she spoke with AIGI Holland on September 29, 2000 during his visit to the office, and she

conveyed substantial concerns regarding race and gender discrimination in the workplace during this conversation, *see* Initial Desc. at 16-19; (2) she filed an EEO complaint in January 2001 after initially contacting an EEO counselor on November 9, 2000, *id.* at 19-22; *see also* Def.'s Stmt. of Mat. Facts ¶ 25; Pl.'s Response to Def.'s Stmt. ¶ 25.

Under the MSPB process, to establish a *prima facie* case for retaliation, Plaintiff was required to show:  (1) she engaged in protected activity; (2) the accused official knew of the protected activity; (3) the adverse employment action under review could, under the circumstances, have been retaliation; and (4) there was a genuine nexus between the retaliation and the adverse employment action.  Initial Desc. at 15 (citing *Cloonan v. U.S. Postal Serv.*, 65 M.S.P.R. 1, 4 (1994)).  Plaintiff must then establish a "genuine nexus" between the protected activity and adverse employment action by proving that the employment action was taken because of the protected activity.  *Id.* (citing *Cloonan*, 65 M.S.P.R. at 4 n.3).  If Plaintiff meets this burden, the Agency must show that it would have taken the same action even absent the protected activity.  *Id.* (citing *Rockwell v. Dep't of Commerce*, 39 M.S.P.R. 217, 222 (1989)).

As to Plaintiff's first allegation in this area, that she conveyed sensitive information to AIGI Holland on his September 29, 2000 visit concerning race and gender-based discrimination in the Atlanta OIG office, the ALJ found that Plaintiff provided "no credible evidence" that she made the allegations of discrimination to AIGI Holland.  *Id.* at 19 ("I find that [Plaintiff] never made the allegations about her discriminatory work environment to Mr. Holland on or about September 29, 2000").  In doing so, the ALJ credited AIGI Holland's testimony, during which he noted that he had only one meeting with Plaintiff that was only eight-to-ten minutes in length, he did most of the talking, she gave no specifics regarding any problems, and "she did not complain

about discriminations, the 'good old boy' atmosphere, disparate treatment, [or] pre-selections."

*Id.* at 18.  The ALJ also noted that SAC Bedwell's testimony reinforced AIGI Holland's

recollection, as SAC Bedwell met with AIGI Holland before and after Holland's conversation

with Plaintiff, and recalled that – at most – the conversation with Plaintiff took fifteen minutes.

*Id.*  Finally, the ALJ emphasized that Ms. Green, one of Plaintiff's closest friends at the office,

had a similar recollection, and that there were various discrepancies between the Plaintiff's

allegations and Ms. Green's testimony.  *Id.* at 19.

Upon a review of the evidence by this Court, it is apparent that the ALJ's conclusion in

this regard is reasonable and supported by substantial evidence.  In addition to the considerations

relied upon by the ALJ, the Court points out that there is simply an absence of any evidence in

the record as to a retaliatory motive on AIGI Holland's part, as Holland had been entirely

uninvolved with the events giving rise to Plaintiff's removal and served only as the deciding

official suggesting removal as the penalty.  Moreover, none of Plaintiff's alleged statements to

Holland related to any misconduct on the part of Holland himself, and there is no evidence in the

record that Holland had harbored any ill feelings toward Plaintiff.  Accordingly, the Court

concludes that even if one accepted Plaintiff's allegations as true, i.e., that an extended meeting

with AIGI Holland occurred during which race and gender discrimination was discussed in

detail, (1) Plaintiff cannot show a "genuine nexus" between the "protected activity" and her

ultimate dismissal, and (2) the Agency has produced substantial evidence showing that Plaintiff's

removal was for reasons unrelated to her race and gender.

As to Plaintiff's second allegation, that her January 2001 EEO complaint laid the

groundwork for impermissible animus and her ultimate removal, the ALJ found that there was no

"genuine nexus" between this complaint and her ultimate removal. *Id.* at 19-25.  It is undisputed

that AIGI Holland, Acting SAC McDade, and SAC Bedwell were aware that Plaintiff had filed

the EEO complaint in January 2001. *Id.* at 19.  However, several considerations compelled the

ALJ's conclusion that no "genuine nexus" between the EEO complaint – centered on SAC

Bedwell's relationship with Plaintiff and the office environment under his tenure – and Plaintiff's

dismissal.  For instance, at most, the evidence showed that SAC Bedwell was only aware that

Plaintiff "was a very unhappy employee." *Id.* at 20.  Despite this knowledge and any existing

problems in their relationship, SAC Bedwell did not hold a grudge and instead approved

Plaintiff's request for six months of leave in 2001; gave Plaintiff the second highest performance

rating in the office for 2000; and – as Ted Martin testified – "did not hold [confrontations]

against the employee in future employment decisions," *id.*  Moreover, there is no evidence in the

record that SAC Bedwell was involved in Plaintiff's termination in any way.  SAC Bedwell

retired in March 2001, while the medical examinations and Plaintiff's noncompliance occurred in

April 2001; moreover, AIGI Holland testified that SAC Bedwell played no role in proposing

Plaintiff's removal, Bedwell testified that he was not consulted by Acting SAC McDade or AIGI

Holland about Plaintiff's removal, and there is no evidence that SAC Bedwell played any role in

the disciplinary action against Plaintiff "other than as a fact witness as to the meeting on October

31, 2000." *Id.* at 22.  In contrast to SAC Bedwell, who had no connection to Plaintiff's removal

but did have a connection to her EEO complaint, AIGI Holland had no connection to Plaintiff's

EEO complaint, as he "was not even working at the FDIC when the matters about which

[Plaintiff] complained in her EEO complaint occurred," *id.* at 21, but was the sole decision-

maker behind her removal.

44

Upon a review of the evidence and the ALJ's reasoning, the Court finds that the ALJ's rejection of Plaintiff's retaliation affirmative defense was supported by substantial evidence, and was neither arbitrary nor capricious.  Rather, the record and evidence adduced reveals that Plaintiff simply presented no evidence that shows a "genuine nexus" between her January 2001 EEO complaint and her removal.  Indeed, the record shows instead that it is highly unlikely that Plaintiff would have suffered any punishment had she complied with the Agency's orders regarding her medical examination and medical records releases.  As such, the Court concludes that Plaintiff's retaliation affirmative defense cannot be maintained in the face of overwhelming, substantial evidence to the contrary.  Accordingly, the Court shall not disturb the Agency's decision to remove Plaintiff, given the nexus between her refusal to obey orders and the Agency's necessary efficiency, and the importance of the proven charges against Plaintiff.

B.      *Plaintiff's Title VII Claims*

In additional to her claims arising under the CSRA, *see* First Am. Compl. ¶ 19(e), Plaintiff also alleges that the Agency violated the strictures of Title VII by subjecting her to (1) race and gender-based discrimination and retaliation, leading to her dismissal from the Agency; and (2) a hostile work environment.  *See id.* ¶¶ 10, 18, 19(a)-(d); *see also* Pl.'s Opp'n 33-35 (looking at hostile work environment), 36-40 (looking at retaliation).  The Court shall review each claim under the applicable standards in turn.

1.      The Relevant Standards for a Title VII Action

In conjunction with her CSRA claims, Plaintiff brings this action pursuant to Title VII, which states that all personnel actions affecting employees "shall be made free from any discrimination based on race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-16(a).

45

It is uncontested that Plaintiff was an employee during the relevant time period and the Agency is an employer within the meaning of Title VII.  The Court exercises jurisdiction over Plaintiff's Title VII claim according to 28 U.S.C. § 1331.

To prove a Title VII violation, Plaintiff must demonstrate by a preponderance of the evidence that the actions taken by the Agency were "more likely than not based on the consideration of impermissible factors" such as race or gender.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (internal quotation marks and citation omitted).  Where, as here, the record contains no direct evidence of discrimination, it is necessary to employ the *McDonnell Douglas* tripartite burden-shifting framework.  *Cones v. Shalala*, 199 F.3d 512, 516 (D.C. Cir. 2000) (citing *McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d  668 (1973)).  It is the district court's responsibility to closely adhere to this analysis and go no further, as it does not sit as a "super-personnel department that reexamines an entity's business decisions."  *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (internal citation and quotation marks omitted).

Under the *McDonnell Douglas* paradigm, Plaintiff has the initial burden of proving by a preponderance of the evidence a "*prima facie*" case of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817.  If she succeeds, the burden shifts to the Agency to articulate some legitimate, non-discriminatory reason for Plaintiff's non-selection or termination, and to produce credible evidence supporting his claim.  *Id.*  The Agency's burden is only one of production, and it "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("[T]he determination that a defendant has met its burden of

production (and has thus rebutted any legal presumption of intentional discrimination) can

involve no credibility assessment.").  As such, "the *McDonnell Douglas* framework shifts

intermediate evidentiary burdens between the parties, [t]he ultimate burden of persuading the

trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times

with the plaintiff."  *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C. Cir.

2003), *cert. denied*, 540 U.S. 881, 124 S. Ct. 325, 157 L.Ed.2d 146 (2003); *see also Burdine*, 450

U.S. at 253, 101 S.Ct. 1089.

      If the FDIC is successful, then "the *McDonnell Douglas* framework -- with its

presumptions and burdens -- disappear[s], and the sole remaining issue [is] discrimination *vel*

*non*."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43, 120 S.Ct. 2097, 147

L.Ed.2d 105 (2000) (internal citations and quotation marks omitted).  At that point, Plaintiff has

the burden of persuasion to show that the Agency's proffered reason was not the true reason for

the employment decision.  *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089.  Pretext may be established

"directly by persuading the court that a discriminatory reason more likely motivated the employer

or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Id.*

at 256, 101 S.Ct. 1089; *see also Reeves*, 530 U.S. at 143, 120 S.Ct. 2097.  "Proof that the

defendant's explanation is unworthy of credence is simply one form of circumstantial evidence

that is probative of intentional discrimination, and it may be quite persuasive."  *Reeves*, 530 U.S.

at 147, 120 S.Ct. 2097 (citing *St. Mary's Honor Ctr.*, 590 U.S. at 517, 113 S.Ct. 2742)

("[P]roving the employer's reason false becomes part of (and often considerably assists) the

greater enterprise of proving that the real reason was intentional discrimination."); *see also Aka*

*v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1290 (D.C. Cir. 1998) (en banc) ("[A] plaintiff's

discrediting of an employer's stated reason for its employment decision is entitled to considerable weight.").

Notably, the Supreme Court has taken care to instruct trial courts that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148, 120 S.Ct. 2097. "[T]he trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." *Id.* at 143, 120 S.Ct. 2097 (quoting *Burdine*, 450 U.S. at 255 n.10, 101 S.Ct. 1089). The Court of Appeals has distilled this analysis, noting that the jury can infer discrimination from the combination of:

> (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements of attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong record in equal opportunity employment).

*Aka*, 156 F.3d at 1289. However, evidence in each of the three categories is not required. *Id.*

"At this stage, if [plaintiff] is unable to adduce evidence that could allow a reasonable trier of fact to conclude that [defendant's] proffered reason was a pretext for discrimination, summary judgment must be entered against [plaintiff]." *Paquin v. Fed. Nat'l Mortgage Ass'n*, 119 F.3d 23, 27-28 (D.C. Cir. 1997). "[T]he court must consider all the evidence in its full context in deciding whether the plaintiff has met his burden of showing that a reasonable jury could conclude that he has suffered discrimination." *Aka*, 156 F.3d at 1290.

2.      Plaintiff's Retaliation Claim

Title VII not only prohibits federal agencies from discriminating on the basis of race and

gender, 42 U.S.C. § 2000e-16, it also prohibits them from retaliating against employees for the

assertion of their rights under Title VII.  *See Forman v. Small*, 271 F.3d 285, 297 (D.C. Cir.

2001), *cert. denied*, 536 U.S. 958, 122 S.Ct. 2661, 153 L.Ed.2d 836 (2002).  To establish a *prima*

*facie* case of retaliation, Plaintiff must show that: (1) she engaged in a statutorily protected

activity; (2) the employer took an adverse personnel action; and (3) a causal connection exists

between the protected activity and the adverse action.  *See Morgan*, 328 F.3d at 651; *Holbrook v.*

*Reno*, 196 F.3d 255, 263 (D.C. Cir. 1999).  "A common element required for discrimination and

retaliation claims against federal employers, and private employers, is thus some form of legally

cognizable adverse action by the employer."  *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir.

1999).  To prove the required third element, i.e., a causal connection, Plaintiff must make a

"showing that the employer had knowledge of the employee's protected activity, and that the

adverse personnel action took place shortly after that activity."  *Mitchell*, 759 F.2d at 86; *see also*

*Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir. 1980) ("[C]ourts have recognized that

proof of causal connection can be established indirectly by showing that discriminatory activity is

followed by discriminatory treatment.").

Here, the Agency has made a "decision to refrain from arguing [in its summary judgment

motion] that [P]laintiff had failed to establish a *prima facie* case of retaliatory removal."  Def.'s

Reply at 20.  Rather, "[r]egardless of whether [P]laintiff could have established a *prima facie*

case," the Agency argues that it has provided the Court with sufficient "sworn evidence,

incorporated within the Administrative Record before the MSPB, delineating the full spectrum of

49

evidence of [the Agency's] legitimate non-retaliatory reasons for having removed [P]laintiff –

reasons that were affirmed by the Administrative Judge who considered that evidence." *Id.*

Defendant contends that Plaintiff's discussion of this evidence "comprises opinion and self-

serving characterization" such that it "fail[s] to establish pretext," *id.*, thereby failing the third

part of the *McDonnell Douglas* burden-shifting framework.

In contrast, Plaintiff alleges that "[a] reasonable jury could conclude that [she] was

terminated in retaliation for her complaints of sex and race-based workplace discrimination."

Pl.'s Opp'n at 36.  In an argument similar to the one she employed before the ALJ at the MSPB

hearing, Plaintiff focuses on the actions of SAC Bedwell.  *Id.* at 36-40.  Plaintiff asserts that SAC

Bedwell was aware of her complaints in September 2000 to AIGI Holland, and that following

September, his harassment of her intensified.  *Id.* at 36-37.  Plaintiff contends that:  (1) SAC

Bedwell's scrutiny of her work, attendance, and location in the office increased to the point

where "she could not even go to the restroom without her manager or assistant manager asking

the secretary where she was," *id.* at 37; (2) SAC Bedwell "repeatedly treated [Plaintiff] in a

hostile manner by screaming at her if she disagreed with him," *id.*; and (3) SAC Bedwell "asked

her intrusive and embarrassing questions about personal and medical issues for no reason other

than curiosity, including inquiring of other female employees regarding her medical condition,"

*id.*  Given this treatment, Plaintiff then makes the logical leap to claim that after she took a leave

of absence from the Agency,

> Then, the agency made her undergo a series of medical examinations – lasting
> more than twelve hours – and tried to make her sign a medical release that did not
> indicate to whom her personal medical records could be distributed, which
> Bedwell knew she was sensitive about.  Finally, the Agency ordered her to appear
> for another medical exam just one day before the scheduled exam – a demand that

> was impossible for her to meet.  When Ms. Vickers was unable to comply with
> these unreasonable requests, she was fired.  A reasonable jury could readily
> conclude that this situation was contrived so that Ms. Vickers would appear to
> have committed misconduct.

*Id.* at 38-39.

Upon an analysis of the evidence presented by Plaintiff and the entire record, the Court concludes that Plaintiff has failed to meet her burden of showing that a reasonable jury could conclude that she was terminated due to retaliation.  *See Aka*, 156 F.3d at 1290.  In this case, the Government has presented a legitimate, non-discriminatory justification for AIGI Holland's decision to terminate Plaintiff – i.e., Plaintiff failed to complete her medical examination; failed to sign the necessary release forms, preventing an independent evaluation of whether Plaintiff was fit to duty; and failed to follow the Agency's orders.  Plaintiff, however, has not adduced evidence that would allow a reasonable trier of fact to conclude that the Agency's proffered reason for her termination was a mere pretext for retaliation and discrimination.  *See Paquin*, 119 F.3d at 27-28.

As the D.C. Circuit held in *Aka*, when making this determination, a court is to focus on whether a reasonable jury could infer discrimination from a combination of (1) Plaintiff's *prima facie* case; (2) any evidence Plaintiff presents to attack the Agency's proffered explanation for its actions; and (3) any further evidence.  *Aka*, 156 F.3d at 1289.  While not challenged by the Agency, Plaintiff's *prima facie* case for retaliation is not particularly strong; indeed, Plaintiff has essentially no direct evidence illuminating a causal connection between her "protected activity" and her ultimate termination, especially considering that the sole target of her complaints – SAC Bedwell – retired in March 2001, before Plaintiff's noncompliance and well before the decision

to remove Plaintiff from the Agency was made.  At most, an indirect causal connection from the fact that the adverse personnel action took place shortly after Plaintiff's "protected activity."  *See Grant*, 622 F.2d at 46.

Plaintiff's case is further weakened by her lack of evidence undermining the Agency's proffered explanation for her termination.  An analysis of Plaintiff's evidence and argument reveals that the foundation of Plaintiff's claim consists almost entirely of opinion and conjecture, relying on a logical leap in attributing perceived retaliatory animus from SAC Bedwell to AIGI Holland's termination decision.  All evidence before this Court indicates that AIGI Holland, acting alone, made the termination decision – which he considered quite difficult.  By the time that AIGI Holland made the decision, SAC Bedwell had been retired for several months, and played no part in the decision.  Moreover, far from some "set-up" or "conspiracy" by SAC Bedwell, the record is also clear that SAC Bedwell was retired well in advance of the decisive events of April 10 and 20, 2001, wherein Plaintiff refused to follow the Agency's clear orders and failed to complete her medical examination.  Further, Plaintiff admitted that she had no problems with AIGI Holland or Acting SAC McDade, who were ultimately responsible for her orders and her termination.  Finally, the record is quite clear that (1) Plaintiff received instructions from the Agency to take certain measures to comply with her medical evaluation, and those instructions were certainly permissible given her position as a law enforcement officer who had voluntarily left work for six months to recover from a depressive disorder; (2) Plaintiff did not report to the PHS as instructed on April 20, 2001, and did not complete the required forms; (3) the Exam Form was certainly a valid form that Plaintiff was previously willing to sign; (4) there was no danger that SAC Bedwell would have discovered her sensitive medical history,

given his retirement and the limitations in the Exam Form; (5) Plaintiff presented no reasonable

excuse for her failure to do so as instructed; and (6) Plaintiff evidenced no intention of ever

signing the release in question.  Accordingly, Plaintiff cannot establish a "genuine nexus"

between SAC Bedwell's alleged retaliatory motivations against her[3] and the Agency's

termination decision months after his retirement.  Far from a "contrived situation" in which the

Agency somehow made it appear that Plaintiff committed misconduct, Pl.'s Opp'n at 39, all

evidence in the record indicates that the misconduct for which Plaintiff's termination was

ultimately sustained was solely the product of Plaintiff's own conscious noncompliance.

As such, the Court concludes that Plaintiff has failed to meet her burden of providing

sufficient evidence for a reasonable jury to conclude that she was terminated due to retaliation.

Rather, her *prima facie* case for retaliation is rather weak, and she presents no evidence showing

a "genuine nexus" between the removal decision and any retaliatory animus by SAC Bedwell.  In

light of the strong evidence supporting the Agency's proffered reason for her termination, and

Plaintiff's clear noncompliance with reasonable orders from the Agency, Plaintiff's

amalgamation of opinion, supposition, conjecture, and tenuous logic is insufficient to prevent

summary judgment on her retaliation claim.

3.     Plaintiff's Hostile Work Environment Claim

Title VII makes it unlawful for an employer to "discriminate against any individual with

respect to compensation, terms, conditions, or privileges of employment, because of such

---

[3] In addition, the Court does note that no evidence in the record supports Plaintiff's theory that SAC Bedwell knew of the alleged contents of her complaints to AIGI Holland in late September 2000.  Rather, the only testimony on the matter, from SAC Bedwell, indicates that Holland simply informed him that "man, you've got one unhappy employee or camper or something like that, words to that effect."  AR Tab 18 (Bedwell Admin. Hr'g Test.), at 18:14-23.

individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "Terms, conditions, or privileges" encompass tangible as well as psychological harm. *See Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). In addition, the Supreme Court has held that "[w]hen the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22, 114 S.Ct.367, 126 L.Ed.2d 295 (1993) (quotation omitted). In attacking Plaintiff's hostile work environment claim, *see* Pl.'s First Am. Compl. ¶ 19(d), the Agency contends (1) ten of the thirteen incidents constituting Plaintiff's hostile work environment claim, *see id.* ¶ 10, are barred due to Plaintiff's failure to contact an EEO counselor and exhaust those claims within the necessary time period; and (2) the remaining incidents are insufficient to constitute a hostile work environment as a matter of law. The Court shall address each argument in turn.

i.   *Defendant's Claim that Many of the Events Which Constitute Plaintiff's Hostile Work Environment Are Time-Barred*

The applicable federal sector EEO regulations require that each complainant bring his or her claim of discrimination to the attention of an EEO counselor within 45 days of the allegedly discriminatory action. *See* 29 C.F.R. § 1614.105(a); 29 C.F.R. § 1614.105(a)(1); *see also* 29 C.F.R. § 1614.107(b) (a federal employee must first raise a matter with an EEO counselor before bringing an EEO complaint with respect to that matter). Compliance with these procedures and time limits is mandatory. "Complainants must timely exhaust these administrative remedies before bringing their claims to court." *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir.

1997); *Bayer v. Dep't of Treasury*, 956 F.2d 330, 332 (D.C. Cir. 1992); *Williams v. Munoz*, 106

F. Supp. 2d 40, 42 (D.D.C. 2000) ("timely administrative charge is a prerequisite to initiation of

a Title VII action").  Failure to contact an EEO counselor within 45 days of the relevant event or

action results in a failure to properly to exhaust administrative remedies and is grounds for

dismissal.  *See, e.g.*, *Saltz v. Lehman*, 672 F.2d 207, 208 (D.C. Cir. 1982) (per curium); *Wilkins v.*

*Daley*, 49 F. Supp. 2d 1, 2 (D.D.C. 1999); *Williamson v. Shalala*, 992 F. Supp. 454, 457-58

(D.D.C. 1998).  However, "[b]ecause untimely exhaustion of administrative remedies is an

affirmative defense, the defendant bears the responsibility of pleading and proving it." *Id.* at 437

(citing *Brown v. Marsh*, 777 F.2d 8, 13 (D.C. Cir. 1985)); *see also Irwin v. Dep't of Veterans*

*Affairs*, 498 U.S. 89, 95-96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990).  Moreover, the

administrative deadlines imposed by this scheme are not jurisdictional in nature:  "they function

like a statute of limitations and like a statute of limitations, are subject to waiver, estoppel, and

equitable tolling."  *Marsh*, 777 F.2d at 14 (citations omitted).

 In this case, Plaintiff initially contacted an EEO counselor to complain about a hostile

work environment based on race and gender on November 9, 2000 – soon after the October 31,

2000 meeting with SAC Bedwell from which Plaintiff abruptly departed and then left the

workplace for a period of six months, having been granted leave without pay at her request.

Def.'s Stmt. of Mat Facts ¶ 25; Pl.'s Response to Def.'s Stmt. ¶ 25.  The 45th day preceding

Plaintiff's contact with an EEO counselor was September 25, 2000.  As noted previously,

Plaintiff's First Amended Complaint alleges thirteen events that compromise her hostile work

environment claim.  *See* First Am. Compl. ¶ 10.  In its Motion for Summary Judgment, the

Agency emphasizes that ten of these thirteen "incidents" – the events numbered 1-7, 9, and 11-12

55

of Paragraph 10 of the First Amended Complaint – are alleged to have occurred prior to

September 25, 2000; as such, the Agency asserts that these incidents "thus cannot provide the

basis of [P]laintiff's hostile work environment claim for failure [to] timely contact an EEO

counselor." Def.'s Mot. for Summ. J. at 35-39.[4]  In response, Plaintiff contends that the

"continuing violation doctrine," as outlined in the United States Supreme Court's seminal

decision in *National Railroad Corporation v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153

L.Ed.2d 106 (2002), ensures that these "incidents" may be considered by the Court for the

purposes of a hostile work environment analysis.

   In *Morgan*, the Supreme Court clarified the appropriate limitations analysis. *See also*

*Singletary v. Dist. of Columbia*, 351 F.3d 519, 526-27 (D.C. Cir. 2003) (discussing *Morgan* and

its impact).  The Court first set out the rule for "discrete discriminatory acts," i.e., terminations

and failure to promote:  these discrete discriminatory acts "are not actionable if time barred, even

when they are related to acts alleged in timely filed charges.  Each discrete discriminatory act

starts a new clock for filing charges alleging that act." *Morgan*, 536 U.S. at 113, 122 S.Ct. 2061.

In contrast, "[h]ostile environment claims are different in kind from discrete acts" because

"[t]heir very nature involves repeated conduct." *Id.* at 115, 122 S.Ct. 2061 (citation omitted).

Such a claim, the Court said, "is comprised of a series of separate acts that collectively constitute

one unlawful employment practice." *Id.* at 116, 122 S.Ct. 2061 (internal quotation marks

omitted).  Moreover, each "single act of harassment" need "not be actionable on its own." *Id.* at

---

   [4] As outlined by the D.C. Circuit in *Jones v. Dist. of Columbia Dep't of Corrections*, No.
04-7181, at 7 (D.C. Cir. Nov. 15, 2005) (Brown, J.), such a defense must be raised in
Defendant's Answer.  Here, Defendant clearly satisfied this requirement. *See* Answer at 1
(Second Defense) ("Plaintiff has failed to exhaust administrative remedies."); (Third Defense)
("Plaintiff has failed to assert certain claims in a timely manner.").

115, 122 S.Ct. 2061 (citations omitted).  As such, the limitations rule for hostile work

environment claims is as follows:

> Provided that an act contributing to the claim occurs within the filing period, the
> entire time period of the hostile work environment may be considered by a court
> for the purposes of determining liability . . . . In order for the charge to be timely,
> the employee need only file a charge within [the required number of days] *of any
> act that is part* of the hostile work environment.

*Id.* at 117-18, 122 S.Ct. 2061 (emphasis added).  Accordingly, "[a] charge alleging a hostile work

environment claim . . . will not be time barred so long as all acts which constitute the claim are

part of the same unlawful employment practice and at least one act falls within the time period."

*Id.* at 122, 122 S.Ct. 2061.

In this case, three of Plaintiff's thirteen identified "incidents" fall within the statutory

time period – i.e., after September 25, 2000: incident #8 (angry threats from SAC Bedwell after

Plaintiff complained about her October 2000 performance evaluation); incident #10 (comment

that a gun was a better weapon than a baton because it eliminates problems "like the Rodney

King case"); and incident #13 (Plaintiff was singled out by SAC Bedwell to provide inordinate

amounts of medical information).  *See supra* Section I(H).  It might therefore seem logical that,

pursuant to *Morgan*, Plaintiff's remaining ten hostile work environment incidents that occurred

prior to these events can be considered by the Court under the "continuing violation doctrine."

However, the Agency objects to this automatic application of *Morgan* by pointing out its precise

language, where the Supreme Court gave an example of the limitations of its "continuing

violation" approach:

> On the other hand, if an act on day 401 had no relation to the acts between days 1-
> 100, or for some other reason, such as intervening action by the employer, was no
> longer part of the same hostile environment claim, then the employee cannot

recover for the previous acts, at least not by reference to the day 401 act.

*Morgan*, 536 U.S. at 118, 122 S.Ct. 2061.

While the D.C. Circuit has not yet specifically addressed the factors that a district court is to consider when analyzing whether an incident can be consider part of "the same hostile environment claim," other circuits have spoken. As the Sixth Circuit described, *Morgan* "requires a trial court to determine whether purported incidents of harassment occurring outside the statutory period are *sufficiently related* to those incidents occurring within the statutory period as to form one continuous hostile work environment." *Wheaton v. North Oakland Med. Ctr.*, 130 Fed. Appx. 773, 787 (6th Cir. 2005) (emphasis in original). "This is a very case-specific inquiry that the trial court is best-equipped to make." *Id.* (reviewing the district court's exclusion of certain incidents under an "abuse of discretion" standard). The Tenth Circuit provides a bit more guidance as to the relevant considerations: "To determine whether these acts are part of the same hostile work environment, *Morgan* advises looking at the type of these acts, the frequency of these acts, and the perpetrator of these acts." *Duncan v. Manager, Dep't of Safety, City and County of Denver*, 397 F.3d 1300, 1309 (10th Cir. 2005) (citing *Morgan*, 536 U.S. at 120, 122 S.Ct. 2061). Under this test, the *Duncan* court excluded acts contributing to a hostile work environment from early in the plaintiff's career which "involve[d] frequent instances of threatening physical and psychological harassment," when "[t]he acts within the filing period involve off-color comments and rumor-spreading perpetuated by a completely different set of actors." *Id.*; *see also Menefee v. Montgomery County Bd. of Educ.*, 137 Fed. Appx. 232, 233-34 (11th Cir. 2005) (per curium) (excluding earlier incidents where they had a different sexual and gender nature than later events).

58

Upon an analysis of Plaintiff's ten alleged incidents falling outside of the statutory time period, the Court finds that incidents #1 through #6 are all unrelated to the hostile work environment claim that she brought before the EEO. These incidents pertain to alleged actions taken by Mike Mitchell, Plaintiff's one-time supervisor before he retired in 1996. *See* Def.'s Stmt. of Mat. Facts ¶¶ 26-31; Pl.'s Response to Def.'s Stmt. ¶¶ 26-31. The bulk of the remaining incidents identified by Plaintiff relate to his successor, SAC Bedwell, and it is SAC Bedwell's actions that are at the heart of Plaintiff's EEO complaint and that fall within the statutory period. Moreover, while Mr. Mitchell is alleged to have acted coarsely and to have made statements with sexual conduct, *see* First Am. Compl. ¶ 10, the incidents attributed to Mr. Bedwell involve the exchange of harsh words between Plaintiff and Bedwell in the context of his exercise of normal supervisory functions over Plaintiff, such as administering performance appraisals, inquiring into an employee's use of sick leave, and inquiring into time management of his subordinates. As such, the type of the alleged acts falling within the statutory period is quite different from the type of acts that Mr. Mitchell is alleged to have committed in the early to mid-1990s. Under the considerations focused upon by *Morgan* and *Duncan*, the Court concludes that incident #1 through incident #6 in Paragraph 10 of Plaintiff's Amended Complaint bear no relationship to the alleged hostile work environment incidents that do fall within the statutory time period. Accordingly, the Court concludes that to permit litigation now over these actions, which were taken by a different individual under different circumstances so long ago, would frustrate the Congressional purpose in passing a tight deadline for filing Title VII claims. *See Duncan*, 397 F.3d at 1309. By any reasonable measure, these six incidents "are not part of the same actionable hostile work environment," *id.*, and may not be saved pursuant to the doctrine espoused in

59

*Morgan*.

Before automatically combining the other four remaining "incidents" involving a hostile work environment – incidents #7, 9, 11, and 12 in Paragraph 10 of Plaintiff's First Amended Complaint – with the incidents within the statutory period, the Court must make one more inquiry.  Specifically, the Court must look to those incidents which do fall within the statutory period, i.e., incidents # 8, 10, and 13, and examine whether they contributed to a "discriminatorily hostile or abusive environment."  *Harris*, 510 U.S. at 21, 114 S.Ct. 367.  If these incidents are merely "offensive without a link to impermissible discrimination, [they] cannot resuscitate plaintiff's claims of hostile work environment which are outside" the statutory period.  *Dahbany-Miraglia v. Queensboro Cmty. College*, Civ. No. 03-8052(SAS), 2004 WL 1192078, at *7-*8 (S.D.N.Y. May 27, 2004) (noting that the proper inquiry is whether the plaintiff's EEOC charge "contains any allegations of hostile work environment falling with the [statutory] period such that allegations falling outside that period remain actionable under the continuing violation doctrine").

> ii.    *Defendant's Claim that the Incidents Alleged Do Not Constitute a Hostile Work Environment Under the Law*

To establish a claim of a hostile work environment based on race or gender, a plaintiff must demonstrate:  "'(1) that he or she suffered intentional discrimination because of race [or gender]; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability.'"  *Raymond v. Capitol Police Bd.*, 157 F. Supp. 2d 50, 57 (D.D.C. 2001) (quoting *Aman v. Cort Furniture*

*Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir. 1996)).  In determining whether a hostile work

environment exists, the Supreme Court has directed the courts to look at the totality of the

circumstances, including "'the frequency of the discriminatory conduct; its severity; whether it is

physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S.

775, 787-88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (quoting *Harris*, 510 U.S. at 23, 114 S.Ct.

367).  While the plaintiff is not required to plead a *prima facie* case of hostile work environment

in the complaint, the alleged facts must be able to support such a claim.  *See Sparrow v. United

Air Lines, Inc.*, 216 F.3d 1111, 1114 (D.C. Cir. 2000).  In addition, the Supreme Court has

circumscribed the definition of a hostile work environment so that "[t]hese standards for judging

hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility

code.'"  *Faragher*, 524 U.S. at 788, 118 S.Ct. 2275 (citations omitted).

     Here, the Court is faced with three incidents that fall within the statutory period:

> Incident #8:  Plaintiff contends that she "was subjected to unjustly reduced performance rating[s], mostly recently on her October 2000 performance evaluation.  When she objected to the ratings given her, and therefore refused to sign the Performance Plan, she was subjected to angry threats from her supervisor."  First Am. Compl. ¶ 10.

> Incident #10:  Plaintiff alleges that she "was subjected to constant derogatory comments made towards women and minorities, such as a comment that was made during the week of October 15, 2000, that a baton is a good weapon to use, but depending on the circumstances a gun is a better weapon because it eliminates problems, 'like the Rodney King case.'"  First Am. Compl. ¶ 10.

> Incident #13:  Plaintiff states that she "was singled out for a requirement to provide inordinate amounts of medical information to support requests for leave."  First Am. Compl. ¶ 10.

*See supra* Section I(H).

Upon a review, it is plain that these three alleged "incidents" within the statutory time frame are insufficient to support a hostile work environment claim.  First, while Plaintiff claims that incident #8 reflects race and gender discrimination, it is uncontested that in her October 2000 performance rating, Plaintiff received a 2.7 rating out of a possible rating of 3.0.  Def.'s Stmt. of Mat. Facts ¶ 36; Pl.'s Response to Def.'s Stmt. ¶ 36.  Plaintiff's 2.7 rating was the second highest rating in the office that year.  *Id.*  Plaintiff also received a $1,500.00 performance award for the 1999-2000 performance cycle by the same supervisor, SAC Bedwell.  *Id.*  Given these uncontested facts, Plaintiff's allegation that her October 2000 performance rating was somehow a reflection of racist or misogynous attitudes in her workplace is without foundation.  However, Plaintiff also contends that when she confronted SAC Bedwell about her problems with the performance evaluation system, he yelled at her "that he was so tired of this, he was tired of her not signing [the evaluation out of protest], that he had spent a great deal of time on her evaluation and that he 'would remember me.'"  *See* Def.'s Mot. for Summ. J., Ex. B (Pl.'s Ans. to Interrogs. No. 1) at 18.  Plaintiff's claim as to SAC Bedwell's "yelling" details a discordant working environment, but not one that could be considered objectively hostile as is required to prevail on such a claim.  *Faragher*, 524 U.S. at 787, 118 S. Ct. 2275.  Importantly, SAC Bedwell's alleged statements are mere offensive utterances that are not physically threatening, are not race or gender-based, and are simply reflective of a tension between a superior and an employee who have clashed over a number of matters.

With respect to the second incident within the statutory time period, i.e., incident #10, Plaintiff identified the source of these Rodney King-related comments as an instructor employed by the Federal Law Enforcement Training Center during discovery.  Def.'s Stmt. of Mat. Facts ¶

37; Pl.'s Response to Def.'s Stmt. ¶ 37.  As such, this individual was not an employee of the

Agency, but was instead employed by a different agency.  Indeed, Plaintiff has presented no

evidence that this instructor was part of Plaintiff's regular work environment.  Accordingly, this

allegation cannot sustain Plaintiff's hostile work environment claim.

As to the third alleged incident within the statutory time period, i.e., incident #13 wherein

Plaintiff contends that she "was singled out for a requirement to provide inordinate amounts of

medical information to support requests for leave," First Am. Compl. ¶ 10, this incident fails to

support a hostile work environment for three reasons.  First, during discovery, Plaintiff failed to

specify any information to support this allegation.  Def.'s Stmt. of Mat. Facts ¶ 35; Pl.'s

Response to Def.'s Stmt. ¶ 35; *see also* Def.'s Mot. for Summ. J., Ex. B (Pl.'s Ans. to Interrogs.

No. 1) at 22 (stating only that "[o]thers were able to take leave by submitting a short note").

Second, the Agency, through the testimony of Ms. Green, who was responsible for time and

attendance matters for the office at the time relevant to Plaintiff's complaints, established that

any added scrutiny given Plaintiff was the result of Plaintiff's having been absent for health

reasons more frequently than other employees, and SAC Bedwell's desire to ensure that Plaintiff

had all the necessary leave slips and doctors statements so that they could be attached to the

payroll form in an appropriate manner.  *See* AR Tab 18 (Joan Green Admin. Hr'g Test.), at 215.

Third, even if Plaintiff was required to provide unwarranted, inordinate amounts of medical

information to support her leave request, such a requirement is not severe, physically threatening,

or an unreasonable interference with Plaintiff's work performance.  As such, it is insufficient to

support a hostile work environment.  *See Raymond*, 157 F. Supp. 2d at 57.

The Court concludes that in analyzing these three incidents within the statutory period, taken individually or collectively, it would be impossible for a reasonable trier of fact to conclude that Plaintiff's workplace "is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment." *Harris*, 510 U.S. at 21, 114 S. Ct. 367 (internal citations and quotation marks omitted). Because these three incidents within the statutory period are insufficient to support a hostile work environment claim, the four "remaining" incidents outside the statutory period – i.e., incidents # 7, 9, 11, and 12 in Paragraph 10 of Plaintiff's First Amended Complaint – cannot be revived under *Morgan* for consideration. *See Dahbany-Miraglia*, 2004 WL 1192078, at *7-*8.[5] Accordingly, Plaintiff's hostile work environment claim is without merit, and must therefore be dismissed.

## IV: CONCLUSION

For the reasons set forth above, the Court shall grant Defendant's Motion for Summary Judgment. As such, Defendant's Motion to Strike a Portion of Plaintiff's Surreply is therefore

---

[5] The Court notes that even if it considered incidents #7, 9, 11, and 12, either individually or in conjunction with the three incidents within the statutory period, Plaintiff's identified incidents would be insufficient to support a hostile work environment. For reasons similar to incident #13, incident #7 – intrusive medical questions – is insufficient. Incident #9, while an offensive utterance, was not severe, physically threatening, or an unreasonable interference with Plaintiff's work performance. Incident #11, wherein an instructor from the legal department at FLETC made racial profiling jokes, *see* Def.'s Mot. for Summ. J., Ex. B (Pl.'s Ans. to Interrogs. No. 1) at 21, is also insufficient because – like incident #10 – the individual was not an employee of the Agency and part of Plaintiff's work environment. Finally, incident #12, which revolved around a negative comment about affirmative action, fails because the comment was not directed at Plaintiff and was made during a private conversation that took place behind a closed door, from which Plaintiff only overheard from the hallway. *See* Def.'s Stmt. of Mat. Facts ¶ 38; Pl.'s Response to Def.'s Stmt. ¶ 38.

moot.  An Order accompanies this Memorandum Opinion.


Date:   November 21, 2005


                              _____/s/_____
                              COLLEEN KOLLAR-KOTELLY
                              United States District Judge